BLACK RADIO NETWORK, INC., a New York Corporation, and News Transmission Service, Inc., a New York Corporation, Statistical Phone Philly, 8484 Associates, Eric Singleton d/b/a "Phone Service," and Anthony Colangelo, Phone Programs, Inc., a New York Corporation, and Accurate Info Ltd., a Florida limited partnership, Plaintiffs,

v.

NYNEX CORPORATION, a Delaware Corporation, New York Telephone Company, a New York Corporation, and Does 1 through 25, Defendants.

Nos. 96 CIV. 4138(DC), 96 CIV. 4139(DC) and 96 CIV. 4141(DC).

United States District Court, S.D. New York.

April 14, 1999.

Order Denying Reconsideration April 30, 1999.

**568**

Roland, Fogel, Koblenz & Carr, LLP, Black Radio Network, Inc. and News Transmission Services, Inc. by Keith J. Roland, Albany, NY, for Plaintiffs.

Karen S. Burstein, Statistical Phone Philly, Eric Singleton d/b/a "Phone Service," and Anthony Colangelo by Karen S. Burstein, New York, NY, for Plaintiffs.

Bressler, Amery & Ross, Phone Programs, Inc. and Accurate Info Ltd. by Eric L. Chase, Genevieve K. LaRobardier, New York, NY, for Plaintiffs.

Davis Polk & Wardwell by Guy Miller Struve, Michele S. Warman, Cindy J. O'Hagan, Katharine L. Strobos, New York, NY, Richard H. Wagner, Robert Ernst, New York, NY, for Defendants Nynex Corporation and New York Telephone Company.

## OPINION

CHIN, District Judge.

The subject of these consolidated cases are the 976 telephone numbers that one may call to hear information on such topics as sports, financial news, horoscopes, and the weather. Plaintiffs are information providers ("IPs") that produce the recorded messages. Defendants NYNEX Corporation ("NYNEX") and New York Telephone Company ("NYTel") are carriers that deliver plaintiffs' recorded messages to thousands of simultaneous callers through NYTel's Downstate Dedicated Mass Announcement Service ("MAS"). Pursuant to contract and tariffs, defendants are responsible for maintaining equipment to tally the actual number of calls made to each IP's 976 numbers, collecting the charges for those calls, and distributing to the IPs their portion of the revenue collected based on the number of calls made to each 976 number.

Plaintiffs' claims involve three core factual allegations. First, plaintiffs allege that, unbeknownst to them, the equipment used by defendants prior to 1990 was not accurately recording the number of calls. Instead of paying plaintiffs for the number of calls actually recorded by the equipment, defendants instead estimated the number of calls. Defendants failed to disclose to plaintiffs, however, that the payments were based on mere estimates and they falsely represented to plaintiffs that the tallies were accurate and based on the actual number of calls recorded by the equipment. Second, plaintiffs allege that defendants unilaterally replaced the original MAS system with another system that defendants and proposed additional defendants, the new system's manufacturer, knew to be unreliable and incapable of accounting for the volume of calls placed to plaintiffs' 976 numbers. Third, plaintiffs allege that defendants engaged in misconduct before the New York State Public Service Commission (the "PSC"), the administrative body responsible for regulating MAS.

Plaintiffs assert several federal and state causes of action, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 to 1968, and the Federal Communications Act ("FCA"), 47 U.S.C. §§ 201 to 207.

Plaintiffs move for leave to file amended and supplemental complaints naming additional defendants pursuant to Rules 15 and 21 of the Federal Rules of Civil Procedure. Defendants cross-move for an order dismissing the complaints with prejudice pursuant to Rules 9(b), 12(b)(1), and 12(b)(6). For the reasons set forth below, defendants' cross-motion is granted in part and denied in part and plaintiffs' motion is granted.

## BACKGROUND

### A. The Facts

As alleged in the proposed amended and supplemental complaints, the facts are as follows:

#### 1. The Audichron System

Prior to September 1990, defendants used equipment manufactured by the Audichron Company ("Audichron") to play the IPs' pre-recorded messages to the calling public. The Audichron equipment, known as the AUTRAX system, kept a "peg count" by mechanically counting each call to 976 numbers, including local and toll calls, as well as intrastate and interstate calls. Defendants represented that AUTRAX was capable of providing access to thousands of callers simultaneously. Defendants were obligated to pay the IPs for each call made to a 976 number. Accordingly, defendants issued monthly reports purporting to set forth the actual peg counts as recorded by AUTRAX.

Between approximately 1977 and 1990, defendants experienced increasing technical problems with AUTRAX. Plaintiffs were unaware of these problems. Specifically, AUTRAX could not accurately han-

dle the call volume or properly account for the number of calls. As early as 1982, defendants acknowledged internally that AUTRAX was not designed as a billing facility and that other systems should be investigated for use in the future. Due to the inadequacies of AUTRAX, defendants began estimating the number of calls and manually altering the peg counts on a daily basis. As early as 1985, NYTel employees responsible for estimating the number of calls informed their supervisors that they lacked sufficient information to adjust the peg counts. Defendants paid plaintiffs according to the altered peg counts rather than the actual peg counts recorded by AUTRAX.

Plaintiffs were not notified of this change in procedure and continued to believe that the altered figures were the peg counts recorded by AUTRAX. When one NYTel employee expressed her view that the IPs should be informed of the truth, her supervisors insisted that this information be kept from the IPs lest they demand higher compensation to make up for lost calls. Audichron also knew the full extent of the unreliability of AUTRAX, concealed the defects, permitted the system deficiencies to continue unabated, and withdrew its support of the system. By the late 1980s/early 1990s, AUTRAX was so unreliable that the call counts were based almost entirely on manual alterations. Because the IPs were unaware of the problems with AUTRAX, they did not challenge the accuracy of call counts or contest the amount of their compensation.

### 2. The Ericsson Cutover

On August 8, 1990, defendants announced their unilateral decision to replace AUTRAX with equipment manufactured and sold by Telefonaktiebolaget LM Ericsson ("LM Ericsson"), Ericsson North America, Inc. ("Ericsson N.A."), and Ericsson Network System, Inc. ("Ericsson

NSI"), (collectively, "Ericsson"),[1] an event that became known as the "Ericsson cutover." The IPs were not consulted or given prior notice of the switch.

Defendants knew that, like AUTRAX, the Ericsson equipment was ill-suited for the high volume of calls made to 976 numbers. Because defendants were aware of problems experienced by other IPs on other Ericsson networks, they knew or should have known that the Ericsson equipment likely would be unable to serve the significantly higher call volume for 976 service. In addition, defendants knew that the Ericsson equipment gave a low priority to data collection, and that, despite representations to the contrary, defendants conducted little or no testing of the Ericsson equipment prior to the Ericsson cutover and failed to follow standard practices and procedures prior to introducing the Ericsson switch to the 976 network.

Despite defendants' knowledge of the problems with the Ericsson system, they represented to and assured plaintiffs that the replacement of AUTRAX with the Ericsson equipment would be "transparent," that is, that there would be no disruption or diminution in service to the 976 network and no reduction in the network's capacity to handle calls to 976 numbers, that plaintiffs and the other IPs would not have to make any changes in their operations, and that service would actually improve as a result of the Ericsson cutover. Ericsson was also aware of the deficiencies in AUTRAX as early as 1988 and participated in deceiving the IPs regarding the reasons for the conversion to the Ericsson system and concealing from plaintiffs the Ericsson equipment's inadequacies.

Some time in September of 1990, upon only a month's notice to the IPs, defendants commenced implementation of the Ericsson cutover. Almost immediately thereafter, however, the call volume to the

---

1. Ericsson N.A., a holding company in the United States, is a subsidiary of LM Ericsson and the immediate parent of Ericsson NSI.

976 numbers took a sudden, drastic downturn. IPs experienced consumer complaints, loss of revenues, loss of calls, and loss of customers to other service providers. Defendants and Ericsson knew of the failures and inadequacies of the Ericsson equipment, but misrepresented and covered-up the extent of the problems when questioned about them by plaintiffs and other IPs.

### 3. *The Administrative Proceeding*

After the Ericsson Cutover, because of the sudden drop in call counts, several IPs complained to the PSC that the new system was not accurately completing or counting calls. *New York Tel. Co. v. Public Serv. Comm'n,* 179 Misc.2d 301, 684 N.Y.S.2d 829 (N.Y. Sup.Ct.1998). To address the IPs' concerns regarding call counting, as well as many other complaints concerning service, the PSC commenced an omnibus proceeding on May 29, 1993 to address all issues relating to the 976 MAS system.[2] (*Id.*). In Phase I of this proceeding, the PSC approved in part a Joint Proposal, filed by NYTel and several IPs, that resolved many of the issues. PSC Op. No. 94–14 (June 1, 1994), *modified in part by* PSC Op. No. 95–10 (Aug. 2, 1995). Pursuant to an October 1, 1993 ruling by Administrative Law Judge Frank S. Robinson (the "ALJ"), the remaining issues were to be decided in Phase II of this proceeding.

Phase II of the omnibus PSC proceeding culminated in the issuance by Judge Robinson of a comprehensive, 189–page recommended decision on January 17, 1997 (the "Recommended Decision").[3] The Recommended Decision was based in part on evidentiary hearings that yielded more than 5,000 pages of transcript and 175 exhibits. Recommended Decision at 2. Judge Robinson rejected the claims of two IPs, including plaintiff Black Radio Network, Inc. ("Black Radio"), for compensation for Audichron call count errors and manual adjustments. *Id.* at 150. Judge Robinson also found that NYTel's actions in connection with the Ericsson cutover were characterized by gross negligence and wilful misconduct. *Id.* at 145. Judge Robinson also concluded that NYTel "mishandled the cutover, causing the IPs to lose large numbers of calls and, consequently, large numbers of customers." *Id.* at 143. Although the ALJ recognized that the PSC "cannot award conventional negligence damages, which must be sought in Court," he recommended that the IPs be awarded the equitable remedy of "refunds" from NYTel totalling $25.2 million. Recommended Decision at 145, 152.

On May 27, 1997, the PSC issued an opinion and order adopting Judge Robinson's Recommended Decision in substantial part. The PSC declined to direct NYTel to pay Black Radio for pre-Ericsson cutover calls according to the original Autrax call counts. PSC Op. No. 97–7, at 10. The PSC agreed with Judge Robinson's "findings and conclusions concerning [NYTel's] conduct in connection with the [Ericsson] cutover." *Id.* at 9. Specifically, the PSC found that NYTel "committed gross negligence and ... engaged in deliberate misconduct." *Id.* at 15. The PSC concluded, however, "that the question of an appropriate remedy must be left to the courts" because Judge Robinson's proposed refund remedy amounted to an award of damages that the PSC lacks jurisdiction to make. *Id.* at 9–10.

2. It appears as though this omnibus proceeding consolidated two PSC cases: Case 93–C–0451, Proceeding on Motion of the Commission to Review Rates, Charges, Rules and Regulations of New York Telephone Company Affecting the Information Provisioning Industry, and Case 91–C–1249, Proceeding on Motion of the Commission Concerning Tariff Revisions to Delete Provisions Pertaining to Charging Interexchange Carriers For Calls to Certain Community Information Service Numbers.

3. During Phase II, the parties engaged in extensive motion practice "necessitating approximately 40 separate written rulings." Recommended Decision at 2.

IPs, including Black Radio, and defendants filed separate Article 78 Proceedings in New York Supreme Court, Albany County, challenging various aspects of the PSC's May 29, 1997 order and opinion. *New York Tel. Co. v. Public Serv. Comm'n,* No. 5655–97; *Black Radio Network, Inc. v. Public Serv. Comm'n,* No. 5949–97; *Evans v. Public Serv. Comm'n,* No. 6019–97. The proceedings were consolidated on October 24, 1997. On December 4, 1998, the Supreme Court (Ceresia, J.) issued a decision denying the relief requested in the consolidated petitions and confirming the determination of the PSC in its entirety. *New York Tel. Co. v. Public Serv. Comm'n,* No. 5655–97 (N.Y. Sup. Ct. Albany County).

Plaintiffs allege that during the course of the hearings before the ALJ, defendants engaged in misconduct related to the hearings, including offering "baseless and untrue" testimony from NYTel employees, improperly acquiring private telephone records, and lying to the ALJ about the availability of an important witness. According to plaintiffs, separate PSC proceedings examining the misconduct of defendants are ongoing.

**B. Procedural History**

Each set of plaintiffs filed a complaint in this Court on June 4, 1996. On August 5, 1996, the Court so ordered a stipulation and order consolidating the three cases and placing them on the Court's suspense calendar until the PSC had issued a final order and any appeals therefrom had been exhausted.

The PSC issued its final order on May 29, 1997. These motions followed.

In their proposed amended and supplemental complaints, plaintiffs each assert a total of sixteen claims, four of which are based on federal law and twelve of which are based on New York statutory and common law. The sixteen claims are as follows: (1) violations of the RICO statute, 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d) (First through Third Counts); (2) viola-

tions of the FCA, 47 U.S.C. §§ 201, 202, and 203 (Twelfth Count); (3) breach of contract (Fourth Count); (4) breach of the covenant of good faith and fair dealing (Fifth Count); (5) breach of agency obligations (Sixth Count); (6) breach of fiduciary duty (Seventh Count); (7) fraud (Eighth Count); (8) gross negligence (Ninth Count); (9) negligence (Tenth Count); (10) violation of New York Public Service Law (Eleventh Count); (11) violation of New York General Business Law (Thirteenth Count); (12) intentional spoliation of evidence (Fourteenth Count); (13) common law civil conspiracy (Fifteenth Count); and (14) accounting (Sixteenth Count). Plaintiffs seek treble damages on the RICO and New York General Business Law claims; compensatory and consequential damages on the remaining claims; punitive damages on the fraud, gross negligence, negligence, New York Public Service Law, and common law civil conspiracy claims; and an accounting, plus interest, costs, and attorneys' fees.

**DISCUSSION**

**A. Legal Standards**

**1. Motions to Dismiss**

In reviewing a motion to dismiss, I must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of plaintiffs. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). A complaint may not be dismissed under Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In other words, the issue before the Court on these motions to dismiss "is not whether ... plaintiff[s] will ultimately prevail but whether the claimant[s][are] entitled to offer evidence to support the claims." *Villager Pond. Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (citation omit-

ted), *cert. denied*, 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996).

■ A court on a motion to dismiss generally may only consider facts alleged in the complaint or in documents attached to the complaint as exhibits or incorporated by reference. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir.1991). The court may also, however, "consider matters of which judicial notice may be taken under Fed.R.Evid. 201." *Id.; see also* Fed. R.Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding."); 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5110, at 522 (1977) ("[C]ourts have always taken judicial notice of facts in ruling on demurrers and motions to dismiss.").

## 2. *Leave to Amend*

■ Leave to amend pursuant to Rule 15(a) of the Federal Rules of Civil Procedure shall be freely granted when justice so requires, and as a general matter amendments are favored "to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *MacDraw, Inc. v. CIT Group Equip. Fin. Co.*, 157 F.3d 956, 962 (2d Cir.1998).

■ The decision to grant leave to amend, however, falls within the sound discretion of the trial court. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir.1998) ("A district court's decision to deny a motion to amend a complaint is reviewed for abuse of discretion."). The district court may deny leave where it would be prejudicial to allow a plaintiff to add claims or the claims would fail to state a claim upon which relief can be granted. *See Lupowitz, Inc. v. Eclipse Holdings, Inc.*, No. 94 Civ. 2916, 1996 WL 285363, at *2 (S.D.N.Y. May 30, 1996), *aff'd*, 108 F.3d 1370, 1997 WL

138459 (2d Cir.1997); *Cohen v. Reed*, 868 F.Supp. 489, 497 (E.D.N.Y.1994).

■ The Court has broad discretion to permit a change in the parties at any stage in the litigation pursuant to Rule 21 of the Federal Rules of Civil Procedure. 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, § 1688, at 471–73 (2d ed.1986). Rule 21 provides in pertinent part that: "Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."

## B. *RICO Claims*

Defendants seek dismissal of plaintiffs' RICO claims on several grounds. First, they invoke the filed rate doctrine and assert that the filed rate doctrine bars plaintiffs' RICO claims because these claims provide for remedies not anticipated by the governing tariffs. Second, they contend that the RICO claims fail as a matter of pleading. Defendants also contend that plaintiffs fail to allege RICO predicate acts and resulting injury.

## 1. *The Filed Rate Doctrine*

■ The filed rate doctrine, sometimes referred to as the filed tariff doctrine, protects both the utility and the customer. The doctrine protects the utility by barring suits that allege that a regulated utility's rates are unreasonable. *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir.1994). A filed rate approved by the governing regulatory agency "is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Id.* The doctrine also protects customers from discrimination by precluding a utility from charging customers a rate other than the rate stated in the tariff. *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (stating that the filed rate "is the only lawful charge" and that "[t]his rule is undeniably strict ... to prevent unjust discrimination" (quoting *Louisville & Nash-*

*ville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915))); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (stating that the doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate" regulatory authority).

■ In a line of cases beginning with *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), courts have identified two principles underlying the filed rate doctrine. *See Wegoland, Ltd. v. NYNEX*, 806 F.Supp. 1112, 1113–16 (S.D.N.Y.1992) (explaining the history and rationale of the doctrine), *aff'd*, 27 F.3d 17, 18 (2d Cir. 1994). First, "legislative bodies design agencies for the specific purpose of setting *uniform* rates." *Wegoland*, 27 F.3d at 19 (emphasis added) (quoting *Wegoland*, 806 F.Supp. at 1115). To permit "individual ratepayers to attack the filed rate 'would undermine the congressional scheme of uniform rate regulation.'" *Id.* (quoting *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 579, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)). Second, because courts are not in the best position to determine, retrospectively, "what the reasonable rates during the past should have been," *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951), to permit "an attack on the filed rate would unnecessarily enmesh the courts in the rate-making process." *Wegoland*, 27 F.3d at 19. Hence, courts apply the filed rate doctrine to bar claims attacking a utility's rate where the effect, directly or indirectly, is either: (1) price discrimination as between ratepayers (the "nondiscrimination strand"), or (2) judicial involvement in the rate-making process (the "nonjusticiability strand"). *See Fax Telecommunicaciones Inc. v. AT & T*, 138 F.3d 479, 489 (2d Cir.1998).

■ Although many cases discuss the filed rate doctrine in the context of federal tariffs, the Second Circuit has held "that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies." *Wegoland*, 27 F.3d at 20; *see also Porr v. NYNEX Corp.*, 230 A.D.2d 564, 660 N.Y.S.2d 440, 443 (2d Dep't 1997) ("[T]he rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency." (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 494 (8th Cir.), *cert. denied*, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992))).

■ I conclude that the filed rate doctrine does not bar plaintiffs' RICO claims for four reasons: (1) plaintiffs' claims do not implicate the principles underlying the filed rate doctrine; (2) the applicable tariffs do not expressly limit plaintiffs' remedies to damages for gross negligence or wilful misconduct; (3) accepting defendants' argument that plaintiffs' RICO claims are barred by the filed rate doctrine would insulate utilities from RICO suits; and (4) the caselaw does not support defendants' position.

**a. *Plaintiffs' Claims Do Not Implicate the Rationale Underlying the Filed Rate Doctrine***

The filed rate doctrine is inapplicable because plaintiffs do not challenge, either directly or indirectly, the reasonableness of the rate contained in any filed tariff. Nor do plaintiffs seek to benefit from a rate different from that provided by the tariff. Rather, plaintiffs contend that defendants failed to comply with the terms of the tariff and they seek, in essence, to enforce the filed tariff. Hence, plaintiffs' claims do not implicate either the nondiscrimination or nonjusticiability strands of the filed rate doctrine. *See Wegoland*, 806 F.Supp. at 1113–16. Nor will plaintiffs' claims undermine the PSC's regulatory authority. *See id.*

The nondiscrimination strand is not implicated because plaintiffs are not seeking

to be treated differently from other customers. They are not seeking to be paid more for the 976 calls than provided for in the tariffs. The concern that a utility charge (or pay) all customers the same filed rate is not present. Likewise, the nonjusticiability strand is not implicated because courts are capable of examining a tariff, deciding whether its terms have been violated, and, if so, awarding damages. Moreover, unlike claims that challenge the reasonableness of a filed rate or seek a refund of the filed rate, claims that seek damages for tariff violations do not require courts to exercise discretion in establishing a reasonable rate.

### b. The Tariffs Do Not Preclude Plaintiffs' Claims

Even if the filed rate doctrine were so broad as to limit plaintiffs' remedies to those permitted by the tariff, as defendants assert, the portions of the applicable tariffs provided by defendants do not expressly limit plaintiffs to a claim for damages for gross negligence or wilful misconduct. The tariff approved by the PSC provides that "no liability shall attach to the Telephone Company for damages arising from errors, mistakes, omissions, interruptions, or delays ... *in the absence of gross negligence or wilful misconduct.*" (Struve Aff. Ex. A § 1(D)(2)(f), at 93 (emphasis added)). The plain meaning of this provision is that if plaintiffs are injured by defendants' gross negligence or wilful misconduct, plaintiffs may pursue a claim for damages. The tariff does not, however, otherwise expressly limit plaintiffs' reme-

dies, nor can such a reading be fairly implied. Even more clearly, the tariff filed with the FCC states that "[t]he Telephone Company's liability, if any, for its wilful misconduct is not limited by this tariff." (*Id.* Ex. B, at 23).

### c. No Public Utility Exception to RICO Exists

■ There is no exception for public utilities in RICO. *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1305 (2d Cir.1990) ("*LILCO* ") (stating that "no specific language [in the RICO statute] suggests, even remotely, that there is a public utility exception."). The Second Circuit has explicitly held "that public utilities ... are subject to the strictures of RICO." *Id.* at 1305. Further, as the Second Circuit noted in *LILCO*, Congress has expressly admonished that RICO be "liberally construed to effectuate its remedial purposes." *Id.* at 1305–06 (quoting Pub.L. 91–452 § 904(a), 84 Stat. 947). If defendants' interpretation of the filed rate doctrine were correct, all utilities would be insulated from all RICO suits. Congress, however, provided for no such exception in the statute.[4]

Defendants, citing several cases, assert that "[i]t is firmly established that the filed tariff doctrine applies to claims under the RICO statute." (Defs. Mem. at 12). Although there are several cases in which courts have held that the filed rate doctrine barred RICO claims, those cases involved direct or indirect challenges to filed rates.[5] Defendants cite *Wegoland Ltd. v.*

4. Defendants attempt to undermine the Second Circuit's clear pronouncement in *LILCO* that public utilities are subject to RICO, by contrasting the Second Circuit's decision in *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir.1994). Defendants argue that *LILCO* is not an authority on the application of the filed rate doctrine because, as the Court noted in *Wegoland*, the issue of the filed rate doctrine was not raised in *LILCO*. (Defs. Reply Mem. at 19). *See Wegoland*, 27 F.3d at 22 (stating that *LILCO* could "by no means be construed as an implicit rejection of the filed rate doctrine"). The Court therefore held "that *LILCO* erects no barrier in this Circuit to the

application of the filed rate doctrine to RICO suits brought by ratepayers against utilities." *Id.* That RICO actions may be barred by the filed rate doctrine, however, does not dictate the conclusion that all RICO actions brought by ratepayers against utilities are so barred. In an action where the filed rate doctrine does not apply, as is the case here, for example, the utility remains subject to the RICO statute.

5. Most of the cases cited by defendants involve challenges to the reasonableness of a filed rate, including cases in which a plaintiff had already paid the filed rate as required.

*NYNEX Corp.*, 27 F.3d 17 (2d Cir.1994), for example, for the proposition that "courts cannot grant remedies to utility customers that are different than the remedies under the governing tariff." (Defs. Mem. at 12). The plaintiffs in *Wegoland*, however, based their RICO claims on allegations that defendants misled regulatory agencies to approve unjustifiably high rates. *Wegoland*, 27 F.3d at 18. Here, plaintiffs do not make any such challenge to the filed rate, but instead seek to enforce the tariff by claiming that defendants violated the tariff and engaged in misconduct before the PSC.

### d. *Caselaw Does Not Support Defendants' Position*

Defendants argue that the rationale and application of the filed rate doctrine is not limited to rates. Defendants assert that the doctrine applies "also to other tariff provisions governing the terms and conditions of utility service." (Defs. Reply Mem. at 16–17). Defendants argue that plaintiffs' remedies are therefore limited to those provided for in the filed tariffs: purportedly only claims for damages arising from defendants' gross negligence or wilful misconduct. That is, defendants argue that "the filed tariff doctrine applies to the present case" barring "plaintiffs' attempt to pile RICO treble damage remedies on top of the remedies provided by the tariff." (*Id.* at 17).

Defendants cite *AT & T Co. v. City of New York*, 83 F.3d 549, 552 (2d Cir.1996), for the proposition that the legal relationship between a utility and its customers is

defined by the tariffs, which consist of the terms and conditions of the utility's service and rates, and supersedes all common law remedies. (Defs. Reply Mem. at 16). *Accord Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir.1998) (stating that the "tariffs conclusively and exclusively enumerate the rights and liabilities of the contracting parties" (quoting *AT & T Co. v. New York City Human Resources Admin.*, 833 F.Supp. 962, 970 (S.D.N.Y.1993))). To further support its assertion that the filed rate doctrine applies here, defendants note that "tariffs have the force and effect of law, and are binding upon both the telephone company and its customers." (Defs. Mem. at 11 (citing *AT & T Co. v. City of New York*, 83 F.3d at 552, and *Sisters of St. Dominic v. Orange & Rockland Power Co.*, 79 A.D.2d 1021, 435 N.Y.S.2d 332, 333 (2d Dep't 1981))).

These cases that state that the legal relationship between a utility and its customers are defined exclusively by the filed tariff, however, are distinguishable from the instant case. In *AT & T Co. v. City of New York*, 83 F.3d 549 (2d Cir.1996), for example, the City of New York had sought indemnification from NYTel for charges the City incurred for long-distance services provided by AT & T. The City had ordered a blocking service preventing inmates at Riker's Island from making long-distance calls. For reasons not apparent from the decision, NYTel had failed to provide the blocking service. The City asserted that NYTel was liable as a matter of law for gross negligence and wilful misconduct under the tariff. It appears as

These cases are inapposite. *See, e.g., Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 45 F.3d 58 (2d Cir.) (plaintiffs claimed that the utility's parent perpetrated a fraud on the regulatory agency thereby inducing the agency to approve unlawfully high rates), *cert. denied*, 514 U.S. 1064, 115 S.Ct. 1693, 131 L.Ed.2d 557 (1995); *Taffet v. Southern Co.*, 967 F.2d 1483, 1485 (11th Cir.) (plaintiffs claimed that "the utility's fraudulent and material misrepresentations to a state rate-setting commission" resulted in the commission approving excessive rates), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992); *H.J.*

*Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 486 (8th Cir.) (plaintiffs asserted that the utility bribed members of the public utilities commission to influence the officials in setting telephone rates), *cert. denied*, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992); *Feiner v. Orange & Rockland Utils., Inc.*, 862 F.Supp. 1084 (S.D.N.Y.1994) (plaintiffs paid rates approved by the PSC); *Fersco v. Empire Blue Cross/Blue Shield*, No. 93 Civ. 4226, 1994 WL 445730 (S.D.N.Y. Aug.17, 1994) (plaintiffs alleged that utility obtained excessive insurance rate increases through fraud on the insurance department).

though the liability provision of the tariff in that case was identical to the liability provision here. *AT & T Co. v. City of New York*, 83 F.3d at 556. The Second Circuit held that "the relevant inquiry [was] whether the negligence of [NYTel] rose to the level of gross negligence." *Id.* Although the court held that NYTel was not liable for gross negligence or wilful misconduct, it did so because NYTel's actions, standing alone, did not rise to the level of gross negligence or wilful misconduct as a matter of law. *Id.* The court did not address, however, the issue of whether the City could have maintained an action other than one for damages based on NYTel's gross negligence or wilful misconduct if in fact NYTel were adjudged to have acted wilfully or with gross negligence.

In the Second Circuit's recent decision in *Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir.1998), the court declared that tariffs "conclusively and exclusively enumerate the rights and liabilities of the contracting parties." *Id.* at 56. *Marcus*, however, can also be distinguished from the instant case. There, plaintiffs alleged that AT & T deceived its customers by failing to disclose that it billed customers per minute rounded up to the next full minute for long distance service. *Id.* at 51.

The *Marcus* court dismissed plaintiffs' claims for fraud damages under the filed rate doctrine. Even though plaintiffs' claims attacked AT & T's billing practices, and not the filed rate *per se*, the filed rate doctrine barred these claims because plaintiffs had paid the approved rates. A contrary holding, the court concluded, would undermine the regulatory agency's rate-making authority because the FCC had approved whole-minute billing. *Id.* at 61. Further, the court determined that the nondiscrimination strand of the doctrine would be implicated because plaintiffs who were able to recover would effectively pay less than unsuccessful litigants who paid the approved rate. *Id.* at 60–61.

In the instant case, however, plaintiffs are not seeking a refund of rates paid, nor are they challenging billing practices approved by a regulatory body. To the contrary, they are contending that defendants wilfully or in a grossly negligent manner failed to comply with the tariff.

The *Marcus* plaintiffs also asserted a claim for breach of warranty. The Second Circuit's treatment of this claim implies that the court would permit other claims where the governing tariff only recognizes utility liability upon a showing of gross negligence or wilful misconduct. Instead of holding that the filed rate doctrine barred plaintiffs' breach of warranty claim, as it did with respect to plaintiffs' other claims, the court reached the merits of the breach of warranty claim. Although the court held that plaintiffs failed to state a claim, it did so on the grounds that one warranty was not breached and that another purported warranty was not found in the tariff. The Second Circuit's discussion suggests that had defendants been found to have breached a warranty, plaintiffs would have been permitted to maintain an action for such breach even though the *Marcus* tariff included a similarly worded liability limitation as here.

In a recent Supreme Court case, *AT & T Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222, *reh'g denied*, —— U.S. ——, 119 S.Ct. 20, 141 L.Ed.2d 781 (1998), respondent Central Office Telephone, Inc. ("COT") alleged that petitioner AT & T failed to deliver various services, provisioning, and billing options that AT & T had agreed to provide, but that were not set forth in the applicable tariff. Although COT's claims did not challenge the filed rate *per se*, plaintiffs in essence sought to benefit from superior service not provided to other customers, and thus pay a lower rate than other customers. As the Court stated: "Any claim for excessive rates can be couched as a claim for inadequate services and vice versa." *Id.* at 1963. The Court held therefore that the filed rate doctrine barred plaintiffs' claims "[b]ecause [the

customer] ask[ed] for privileges not included in the tariff." *Id.* at 1964.

The logical corollary to the Court's reasoning is that COT's claims would not have been barred by the doctrine if the privileges AT & T allegedly failed to provide had been included in the tariff. While it is true that the tariff discussed in the Court's opinion did not limit AT & T's potential liability, Chief Justice Rehnquist explained in his concurring opinion that the filed tariff "does not affect whatever duties state law might impose." *Id.* at 1966. The filed rate doctrine "does not serve as a shield against all actions based in state law." *Id.* at 1966–67.

Another recent Supreme Court case, *Humana Inc. v. Forsyth*, —— U.S. ——, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999), does not involve the filed rate doctrine, but nonetheless undermines defendants' assertion that plaintiffs' RICO claims must be dismissed. In *Humana*, insurance policy beneficiaries filed RICO and state law claims against a group health insurer and hospital. Humana insurance company agreed to pay eighty percent of a policy beneficiary's hospital charges, leaving the beneficiary responsible for the remaining twenty percent in addition to an initial deductible. *Id.* at 712. Plaintiff beneficiaries alleged that the hospital gave Humana large discounts on the insurer's portion of the charges pursuant to a concealed agreement between the hospital and the insurance company. *Id.* The agreement resulted in Humana paying significantly less than the eighty percent of the total charge for which it was responsible. *Id.*

Defendants argued that plaintiff's RICO claims were barred by the McCarran–Ferguson Act (the "Act"), ch. 20, 59 Stat. 33 (1945) (codified as amended at 15 U.S.C. §§ 1011–1015 (1994)). The Act precludes application of a federal statute in the face of a state law enacted to regulate the insurance industry if the federal measure does not "specifically relat[e] to the business of insurance," and would "invalidate, impair, or supersede" the state law. The Court ruled that: "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran–Ferguson Act does not preclude its application." *Id.* at 713. The Court held that the Act did not bar the beneficiaries' RICO claims because RICO advanced the state's interest in combatting insurance fraud and did not frustrate state policy or disturb the administrative regime. *Id.*

Similarly, the application of RICO to utilities would not, in appropriate instances, frustrate state policy or interfere with New York's administrative regime. *See LILCO*, 907 F.2d at 1309 (quoting New York's Attorney General as stating to the district court that an award of damages in that case, where plaintiffs asserted RICO and other claims against a utility, "would enhance, rather than conflict with, New York's regulatory scheme").

In sum, the applicable tariffs do not expressly limit defendants' liability to damages for gross negligence and wilful misconduct. Moreover, even if they did, the filed rate doctrine does not apply in the circumstances of this case and plaintiffs' RICO claims are not barred on this basis.

### 2. *Substantive RICO Arguments*

Plaintiffs allege in their proposed amended and supplemental complaints that defendants and proposed defendants engaged in a pattern of racketeering, based on acts of mail fraud, wire fraud, and witness tampering, in violation of 18 U.S.C. §§ 1962(b), (c), and (d).

### a. *Section 1962(b)*

Section 1962(b) of RICO provides:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or

the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b). The statute's definition of an "enterprise" includes "any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4).

To state a claim for a violation of § 1962(b), plaintiffs must allege that the object of defendants' racketeering activity was to gain an interest in or maintain control of the enterprise. *See Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1062–63 (2d Cir.1996) (dismissing § 1962(b) claim in part because plaintiff did not allege facts to support a finding that the defendant acquired or maintained control of the enterprise through a pattern of racketeering), *cert. denied as to RICO claims,* —— U.S. ——, 118 S.Ct. 49, 139 L.Ed.2d 14 (1997).

Section 1962(b) further requires that plaintiffs allege injury from defendants' acquisition or control of the enterprise—an "acquisition injury"—that is distinct from injury based on the alleged predicate acts. *Discon,* 93 F.3d at 1063 (ruling that plaintiffs cannot state a cause of action under § 1962(b) "[w]ithout a distinct 'acquisition injury'").

Plaintiffs allege that an enterprise by association in fact was formed by "the Downstate Dedicated MAS or 976 component of [NYTel], its executives and employees, including [d]efendants Cerar, Goldrick, Nelson and agents of NYNEX and [NYTel] with LM Ericsson, Ericsson N.A., and Ericsson, certain long distance providers, and Does 1 through 25." (BRN Am. Compl. ¶ 115). Plaintiffs emphasize that they do not allege that defendants gained an interest in the enterprise through racketeering, but rather that defendants maintained control of the enterprise through racketeering. (PPI Mem. at 46).

Defendants advance two arguments. First, defendants argue that plaintiffs fail to present "any substantiating factual allegations" to support the claim that the alleged predicate acts were perpetrated to gain an interest in or maintain control of an enterprise. (Defs. Mem. at 16). *See Discon,* 93 F.3d at 1062–63. Second, defendants argue that plaintiffs have not alleged any injury resulting from defendants' purported maintenance of an interest in the enterprise. (Defs. Mem. at 17; Defs. Reply Mem. at 21). I accept defendants' arguments, in both respects.

First, plaintiffs have not sufficiently alleged that the object of defendants' alleged racketeering activity was to maintain control of the enterprise. Rather, the allegations of the complaint plainly show that defendants did not need to engage in the alleged racketeering activity to maintain control of the alleged enterprise. The alleged enterprise—the 976 component of defendants and others—would have remained in defendants' control even without the alleged racketeering activities. Moreover, defendants engaged in those activities, according to plaintiffs, to injure plaintiffs or for monetary gain, not to maintain control of the enterprise. Accordingly, plaintiffs do not allege that the purported racketeering activities were perpetrated by defendants to maintain control of the enterprise.

Second, plaintiffs have not alleged a separate "acquisition" or "control maintenance" injury. Plaintiffs have not alleged, even assuming that defendants did engage in the purported racketeering activities to maintain control of the enterprise, that they were injured as a result of those efforts to maintain control. Instead, plaintiffs only allege injury resulting from defendants' commission of the alleged racketeering acts. (*See* SPP Mem. at 28 (stating that defendants' alleged racketeering acts "accomplished the enterprise's goal of harming the [p]laintiffs' business and earnings"); PPI Mem. at 21 (stating that it was "the pattern of racketeering whereby [p]laintiffs were seriously harmed")). Accordingly, plaintiffs fail to state a claim under 18 U.S.C. § 1962(b).

#### b. *Section 1962(c)*

Section 1962(c) of RICO provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c); *see Gruntal & Co. v. San Diego Bancorp,* 901 F.Supp. 607, 616 (S.D.N.Y.1995).

■ The Supreme Court has held that a RICO enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). To establish the existence of a RICO enterprise, plaintiffs must prove an "ongoing organization, formal or informal," in which "the various associates function as a continuing unit." *Id.; see United States v. Coonan,* 938 F.2d 1553, 1560–61 (2d Cir. 1991), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992).

■ The Second Circuit has stated that "the existence of an association-in-fact is oftentimes more readily proven by 'what it *does,* rather than by abstract analysis of its structure.'" *Coonan,* 938 F.2d at 1559. Proof of racketeering activity may therefore be relied upon to establish the existence of an enterprise. *Id.* at 1559–60. The enterprise, however, must nonetheless be an entity separate from the pattern of racketeering activity in which it engages. *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524; *see Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 349 (S.D.N.Y.1998) (suggesting that " 'in assessing whether an alleged enterprise has an ascertainable structure dis-

tinct from that inherent in a pattern of racketeering,' it is appropriate to consider whether 'the enterprise would still exist were the predicate acts removed from the equation.' " (quoting *Handeen v. Lemaire,* 112 F.3d 1339, 1352 (8th Cir.1997))).

■ Further, the Second Circuit has held that under § 1962(c), the "person" and the "enterprise" must be distinct, that is, a corporate entity may not be both the enterprise and the person who conducts the affairs of the enterprise through racketeering. *Bennett v. United States Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *R.C.M. Executive Gallery Corp., v. Rols Capital Co.,* 901 F.Supp. 630, 639 (S.D.N.Y.1995). This distinctiveness requirement cannot be met merely by alleging that a RICO enterprise consists of a corporate defendant in association with its own employees who carry out the corporate defendant's regular affairs. *Discon,* 93 F.3d at 1063–64; *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir.1994).

■ Plaintiffs have failed to adequately allege the existence of an enterprise for purposes of § 1962(c), for they have failed to allege an enterprise that is separate and distinct from the alleged pattern of racketeering activity. First, plaintiffs do not allege facts to support a claim that any proposed non-NYNEX/NYTel defendant participated in the operation of the purported enterprise. The only non-NYNEX/NYTel defendants identified are Ericsson and certain unnamed long-distance carriers, but the proposed amended complaints allege only that Ericsson supplied equipment to NYTel and made certain misrepresentations and omissions concerning the equipment.[6] There are no

---

**6.** PPI argues that they should not now be required to plead the specifics of the enterprise's organization. (PPI Mem. at 51). PPI asserts that they require discovery to uncover the specifics as to the organization of the enterprise because such facts are "exclusively

known to [d]efendants." (*Id.*). Plaintiffs are not entitled, however, to conduct discovery to discover facts that would establish a RICO enterprise. *See Giannacopolous v. Credit Suisse,* 965 F.Supp. 549, 552–53 (S.D.N.Y. 1997) (denying request for discovery on the

concrete allegations to the effect that Ericsson and the long-distance providers continued in "the enterprise's hierarchy, organization and activities." *Coonan,* 938 F.2d at 1560.

■■■■■ Second, the only remaining enterprise participants are employees of NYNEX and its corporate affiliates. Corporate affiliates and their employees cannot constitute a RICO enterprise by themselves. A corporate entity cannot be both the enterprise and the person who conducts the affairs of the enterprise through racketeering.

Third, even assuming plaintiffs have adequately alleged that Ericsson and the long-distance carriers were part of a continuing unit, plaintiffs have not alleged an enterprise separate from its pattern of racketeering activity. *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524. Even assuming that these proposed defendants were part of a continuing enterprise, it was a part of that enterprise only by virtue of the alleged racketeering activity. Plaintiffs simply have not alleged "an ascertainable structure distinct from that inherent in [the alleged] pattern of racketeering," and it is apparent that the alleged enterprise, including the proposed defendants, would not still exist were the predicate acts removed from the equation. *See Schmidt,* 16 F.Supp.2d at 349 (quoting *Handeen v. Lemaire,* 112 F.3d at 1352). Accordingly, plaintiffs fail to state a claim under 18 U.S.C. § 1962(c).

#### c. *Section 1962(d)*

■■■■ Section 1962(d) prohibits any conspiracy to commit a RICO violation. A RICO conspiracy claim must fail, however, if the substantive claims themselves are deficient. *Discon,* 93 F.3d at 1064; *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990).

■■■■■ Even assuming plaintiffs had presented viable claims under 18 U.S.C. § 1962(b) or (c), plaintiff's conspiracy claim

issue of RICO continuity and dismissing the

would still fail. To state a claim under § 1962(d) plaintiffs must allege facts that support a conclusion that defendants consciously agreed to commit predicate acts. *Hecht,* 897 F.2d at 25. Conclusory allegations of a conspiracy are insufficient. *See id.* ("Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."); *see, e.g., Naso v. Park,* 850 F.Supp. 264, 275 (S.D.N.Y.1994) (dismissing RICO conspiracy claim because the complaint "simply does not make specific factual allegations from which we can conclude that defendants consciously agreed to commit predicate acts").

Plaintiffs' allegations of "a continuous agreement" between NYNEX, NYTel, and the Ericsson companies fall short of the specificity required to allege that defendants consciously agreed to commit predicate acts. Accordingly, plaintiffs RICO civil conspiracy claim must be dismissed as well.

#### C. *Remaining Claims*

The remaining claims will be addressed in the context of each set of core factual allegations: first, the Ericsson cutover, then the Audichron call count adjustments, and finally, the misconduct before the PSC.

#### 1. *Ericsson Cutover Claims*

Plaintiffs assert nine claims based on the Ericsson cutover: a claim for violation of the FCA (Twelfth Count) and state law claims for breach of contract (Fourth Count), breach of the covenant of good faith and fair dealing (Fifth Count), fraud (Eighth Count), gross negligence (Ninth Count), negligence (Tenth Count), violation of the New York Public Service Law (Eleventh Count), violation of New York General Business Law (Thirteenth Count), and civil conspiracy (Fifteenth Count).

RICO claim).

### a. *FCA Claims*

 The FCA requires that all complaints against carriers for the recovery of damages, which are not based on overcharges, be filed with the FCC within two years after the cause of action accrues. 47 U.S.C. § 415(b). The two-year statute of limitations also applies to actions filed in court instead of with the FCC. *E.q., Nordlicht v. New York Tel. Co.,* 617 F.Supp. 220, 228 (S.D.N.Y.1985), *aff'd,* 799 F.2d 859 (2d Cir.1986), *cert. denied,* 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987). Fraudulent concealment tolls the statute of limitations, but only until the plaintiff has notice of a possible claim. *Stone v. Williams,* 970 F.2d 1043, 1048–49 (2d Cir. 1992), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993); *Rosner v. Codata Corp.,* 917 F.Supp. 1009, 1019 (S.D.N.Y.1996).

Defendants argue that plaintiffs' FCA claims are barred by the statute of limitations. They first note, and plaintiffs do not dispute, that plaintiffs' FCA claims are limited to the period ending December 30, 1991 because the governing FCC tariff ceased to be effective on that date. (Defs. Mem. at 30). Defendants therefore apparently take the position that plaintiffs were required to commence suit by December 30, 1993. As noted above, however, plaintiffs did not file their original complaint until June 4, 1996.

Defendants contend that plaintiffs had notice of a claim based on the September 1990 Ericsson cutover, because complaints by IPs about the cutover began immediately and were among the issues noted when the PSC proceedings began. (Defs. Mem. at 31). Plaintiffs argue that their complaints allege that NYNEX and NYTel fraudulently concealed their conduct, and that as a consequence the statute of limitations was tolled. (BRN Am. Compl. ¶ 270). SPP argues that plaintiffs did not learn of defendants' wilful misconduct regarding the Ericsson cutover until 1996, when a NYTel witness testified as to defendants' alleged misconduct. (SPP Mem. at 35).

 Issues of fact exist as to whether plaintiffs had sufficient notice of the alleged wilful misconduct prior to 1996. The ALJ noted, for example, that when NYTel was "[c]onfronted with a mess of its own making, the company not only failed to act expeditiously to clean it up, but instead focused its efforts on covering it up." Recommended Decision at 133–34. The ALJ also described NYTel's assertion that there was no connection between the striking call count decline and the cutover as "simply incredible." *Id.* at 143; *see also id.* n. 2 ("This unashamed company denial of the undeniable is yet another demonstration of the company's reflex to stonewall that has been all too evident throughout this proceeding."). At a minimum, issues of fact exist as to whether the statute of limitations was tolled because defendants concealed their conduct. Accordingly, defendants' motion for summary judgment with respect to this claim is denied.

### b. *State Law Claims*

#### (1) *Statute of Limitations*

Defendants contend that where the applicable tariff limits a telephone company's liability to a showing of gross negligence or wilful misconduct, the three-year negligence statute of limitations applies. *Columbe v. New York Tel. Co.,* 102 A.D.2d 909, 477 N.Y.S.2d 490, 491 (3d Dep't 1984); *Zuckerbrod v. New York Tel. Co.,* 87 A.D.2d 574, 447 N.Y.S.2d 742, 743 (2d Dep't 1982). If a defendant engaged in fraud to conceal its conduct, the statute of limitations is two years from the date that plaintiffs had notice of a possible claim. *See* N.Y. C.P.L.R. 203(g) (West Supp. 1999).

Defendants claim that plaintiffs' claims are time-barred because suit was filed on June 4, 1996, more than three years after the Ericsson cutover. (Defs. Mem. at 36). Defendants again assert that even though

plaintiffs claim that defendants fraudulently concealed problems with the cutover, plaintiffs were on notice in 1990 of a possible claim and that therefore the statute of limitations was not tolled. (*Id.*). For the reasons stated above, questions of fact exist as to whether plaintiff had notice of a possible claim prior to 1996 or whether the statute was tolled due to defendants' conduct.

### (2) *Sufficiency of the Claims*

### (a) *New York General Business Law Claim*

Section 349 of New York's General Business Law, part of the state's consumer protection statute, creates a private right of action for injuries to consumers resulting from deceptive trade practices. N.Y. Gen. Bus. Law § 349(h). To state a claim under the statute, the plaintiff must allege that the defendant's deceptive practices were materially misleading and caused the plaintiff's injury. *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir.1996) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 623 N.Y.S.2d 529, 532, 647 N.E.2d 741 (Ct.App. 1995)).

As the Second Circuit has noted, § 349 "was not intended to be a 'sword to be wielded in business-versus-business disputes ... where the party asserting the claim is not acting in a consumer role.'" *S.Q.K.F.C.*, 84 F.3d at 636 (quoting Richard E. Givens, *Overall Scope of General Business Law §§ 349–350*, Supplementary Practice Commentaries 166, 167 (McKinney Supp.1996)). A plaintiff must "demonstrate that the acts or practices have a broader impact on consumers at large." *S.Q.K.F.C.*, 84 F.3d at 636 (quoting *Oswego*, 623 N.Y.S.2d at 532, 647 N.E.2d 741); *see Grand General Store, Inc. v. Royal Indemnity Co.*, No. 93 Civ. 3741, 1994 WL 163973, at *3 (S.D.N.Y. Apr. 22, 1994) (citing *Genesco Entertainment v. Koch*, 593 F.Supp. 743 (S.D.N.Y.1984) (Weinfeld, J.)).

Defendants assert that plaintiffs' claim based on violation of § 349 must be dismissed. I agree. Although plaintiffs claim that they were acting as consumers and thus should be protected by the statute, in fact this case involves businesses engaged in arm's length transactions for services that are not available to the general public. Nor, of course, does the fact that consumers were the ultimate end-users convert the transaction into a consumer transaction. Further, plaintiffs' amended complaints are devoid of any reference to harm to the public at large. Instead, plaintiffs focus exclusively on their own alleged injury.

### (b) *Civil Conspiracy*

To state a claim for civil conspiracy, a plaintiff must allege damage stemming from an agreement between two or more persons to accomplish an unlawful purpose as well as intentional participation in efforts to further that purpose. *Dillion v. U.S. Postal Serv.*, No. 94 Civ. 3187, 1995 WL 447789, at *4 (S.D.N.Y. July 28, 1995). Conclusory allegations of a conspiracy are not sufficient; rather, a plaintiff must allege facts from which a trier of fact can infer such an agreement. *Id.* at *4 (citing *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir.1977)). In New York, civil conspiracy is a derivative claim; New York does not recognize an independent tort of civil conspiracy. *Wall Street Transcript Corp. v. Ziff Communications Co.*, 225 A.D.2d 322, 638 N.Y.S.2d 640, 641 (1st Dep't 1996).

Plaintiffs' factual allegations that defendants "conspired to commit fraudulent acts and omissions" fall short of the specificity required to state a claim for civil conspiracy. Accordingly, plaintiffs' common law civil conspiracy claim must also be dismissed.

### (c) *Negligence*

Plaintiffs' simple negligence claims must also be dismissed, for the PSC tariff clearly states that defendants are

only liable upon a showing of gross negligence or wilful misconduct.

### (d) *Surviving Claims*

The following claims based on the Ericsson cutover survive: breach of contract, breach of the covenant of good faith and fair dealing, fraud,[7] gross negligence, and violation of the New York Public Service Law. Defendants' argument that these claims are barred by the filed rate doctrine is rejected for the reasons set forth above in the discussion of the RICO claims.

### 2. *Audichron Call Count Adjustments Claims*

Plaintiffs assert ten claims based on the Audichron call count adjustments: breach of contract (Fourth Count), breach of the covenant of good faith and fair dealing (Fifth Count), breach of agency obligations (Sixth Count), breach of fiduciary duty (Seventh Count), fraud (Eighth Count), violation of the New York Public Service Law (Eleventh Count), violation of the FCA (Twelfth Count), violation of the New York General Business Law (Thirteenth Count), civil conspiracy (Fifteenth Count), and an accounting (Sixteenth Count). All of these claims must be dismissed, for plaintiffs have failed to allege that they suffered any damages as a result of the Audichron call count adjustments. In addition, because Black Radio asserted these claims in the PSC and Article 78 proceedings and lost, it is barred from pursuing the claims now by the doctrine of res judicata.

### a. *Failure to Allege Damages*

██ The applicable tariffs required defendants to pay plaintiffs a certain amount for each call placed to an IP's 976 number. Plaintiffs allege that defendants "affirmatively represented" that plaintiffs "would be paid a fee per call for each call recorded by the Audichron" system. (BRN Am. Compl. ¶ 49). Plaintiffs further allege that

defendants "fraudulently altered" the Audichron call counts and "fraudulently concealed such alterations from the IPs," thereby paying plaintiffs "on the basis of the fraudulently altered call counts." (*Id.* at 263).

Defendants argue that plaintiffs' claims based on the Audichron call counts fail to state a claim upon which relief may be granted because plaintiffs fail to allege that the adjustments resulted in an understatement of the actual number of calls completed. (Defs. Mem. at 31, 40–43; Defs. Reply Mem. at 32). Specifically, defendants state: "[P]laintiffs' pleadings in this proceeding do not claim that they were compensated for less than the actual number of completed calls." (Defs. Mem. at 7). Plaintiffs do not disagree. SPP acknowledges that it has "not specifically alleged" that the result of defendants' alleged Audichron misconduct was underpayment. (SPP Mem. at 42–43). Similarly, PPI states that "[p]laintiffs require additional discovery to attempt to determine the deficiencies in compensation resulting from call count adjustments before the [Ericsson cutover]." (PPI Mem. at 21). Likewise, Black Radio states that "the ultimate question of [its] Audichron damages remains open." (BRN Mem. at 23).

Plaintiffs' position that the tariffs required defendants to pay plaintiffs for the unadjusted number of calls counted by AUTRAX, rather than for the number of calls actually placed to an IPs' 976 number, is untenable. (BRN Mem. at 22). As the New York Supreme Court stated in the Article 78 proceeding, defendants were required to pay IPs for "each completed call," that is, for each "actual call." *New York Tel Co. v. Public Serv. Comm'n,* 179 Misc.2d 301, 684 N.Y.S.2d 829 (N.Y. Sup. Ct.1998); *id.* (stating that "[n]othing in the plain language of the tariff required the PSC to conclude that [Black Radio] must

---

7. Plaintiffs' fraud claim is adequately pled despite defendants' argument that plaintiffs

have failed to allege appropriate fraud damages. (Defs. Mem. at 35 n. 15).

be compensated based on the original" call counts).

Plaintiffs therefore have not alleged any damages based on the Audichron adjustments in their complaints, proposed amended complaints, or in their papers filed in connection with this motion. It is apparent that plaintiffs have not alleged such damages for good reason—they simply do not have any evidence that they were so damaged. If any evidence had surfaced during the extensive PSC proceedings, surely plaintiffs would have alleged damages here. Because plaintiffs do not otherwise allege that defendants paid for less than the number of actual calls, plaintiffs' claims based on violation of the tariffs by the Audichron call count adjustments must be dismissed.[8]

### b. *Res Judicata*

 Res judicata is an important doctrine that reduces the burden of litigation by conserving judicial resources and preventing inconsistent decisions. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Under New York law, an earlier litigated claim bars a later claim arising out of the same factual grouping even if the later claim is based on different legal theories or seeks dissimilar or additional relief. *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994); *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158 (Ct.App.1981). Res judicata may also apply if the earlier action was an Article 78 proceeding. *See, e.g., Lappas v. City of New York*, No. 87 Civ. 1104, 1995 WL 66626 (S.D.N.Y. Feb. 16, 1995); *O'Brien*, 54 N.Y.2d 353, 445 N.Y.S.2d 687, 429 N.E.2d 1158.

 Black Radio was the only one of plaintiffs here that asserted a claim before the PSC based on the Audichron adjustments. During the PSC proceedings, Black Radio argued that it should have been paid based on the unadjusted Audichron call counts rather than the adjusted counts. Black Radio concedes, however, that "[t]he PSC ultimately ruled against [it] in connection with its Audichron claims." (BRN Mem. at 23). The New York Supreme Court subsequently upheld the PSC's determination in an Article 78 proceeding. *New York Tel. Co. v. Public Serv. Comm'n*, 179 Misc.2d 301, 684 N.Y.S.2d 829 (Sup.Ct. 1998). The New York Supreme Court upheld the PSC's conclusion that Black Radio's original Audichron call counts were "erroneously inflated." *Id.* at 30. As the ALJ concluded, use of Black Radio's unadjusted call counts as accurate counts of actual calls was "insupportable" "given the great body of evidence that those numbers were subject to chronic error." *Id.* at 29 (quoting the ALJ's Recommended Decision at 150). Indeed, the New York Supreme Court upheld the ALJ's determination "that the adjusted Autrax call counts sufficiently reflected [BRN's] actual call counts as accurately as possible." *Id.* at 30. Black Radio has had a full and fair opportunity to litigate its claims based on the Audichron call count adjustments on the merits. Accordingly, its claims for damages based on the Audichron adjustments are also barred by the doctrine of res judicata.

### 3. *Claims Based on Misconduct Before the PSC*

Plaintiffs assert three claims based on defendants' alleged misconduct before the

---

**8.** Plaintiffs request permission to add to their complaints should discovery reveal that defendants paid them for less than the actual number of calls. (SPP Mem. at 42). Plaintiffs, however, have had ample opportunity to conduct discovery in the years of PSC proceedings and additional discovery at this time is not warranted. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131–32 (2d Cir.1993) (affirming dismissal without leave to amend where plaintiff had ample access to discovery in prior arbitration proceeding). Further, plaintiffs must state a legally viable claim before being permitted to engage in discovery. *See Madonna v. United States*, 878 F.2d 62, 66 (2d Cir.1989); *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1083 (7th Cir. 1987), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988). Plaintiffs' application is therefore denied.

PSC: fraud, spoliation of evidence, and civil conspiracy.

■ These claims are dismissed. In essence, plaintiffs are asking this Court to sit as an appellate court in review of the PSC proceedings. If defendants engaged in misconduct before the PSC, plaintiffs' remedy is to seek relief from the PSC and, if appropriate, to then seek review in the state courts. In fact, plaintiffs indicate in their proposed complaints that PSC proceedings investigating defendants' alleged misconduct before the PSC are still pending. (BRN Am. Compl. ¶ 111). Plaintiffs have not articulated any basis for this Court to interfere in the on-going state administrative proceedings.

■ In addition, New York follows "the majority view and [does] not recognize spoliation of evidence as a cognizable tort action." *Weigl v. Quincy Specialties Co.*, 158 Misc.2d 753, 601 N.Y.S.2d 774, 776 (Sup.Ct.1993). Finally, plaintiffs fail to allege adequate facts to sustain a conspiracy claim based on defendants' alleged misconduct before the PSC and, again, New York does not recognize an independent tort of civil conspiracy. *Wall Street Transcript Corp.*, 638 N.Y.S.2d at 641. Accordingly, these claims are dismissed on these bases as well.

### CONCLUSION

For the reasons set forth above, defendants' cross-motion to dismiss is granted in part and denied in part, and plaintiffs' motion for leave to file amended and supplemental complaints is granted. The parties shall appear for a pretrial conference on May 14, 1999 at 2:30 p.m. in Courtroom 11A at 500 Pearl Street.

SO ORDERED.

### ORDER

Plaintiff Phone Programs, Inc. moves for reconsideration and clarification of the Court's April 13, 1999 opinion. Plaintiffs Statistical Phone Philly and Black Radio Network, Inc. join in the motion. First, plaintiffs contest the dismissal of their RICO claims. Second, plaintiffs seek leave to replead claims based on defendants' alleged misconduct before the New York Public Service Commission (the "PSC"). Third, plaintiffs seek clarification of the disposition of claims against the individual defendants. For the reasons set forth in my Opinion, the motion is denied. I add only the following:

1. Plaintiffs contend that the Court erred in dismissing their RICO claims because the Court "misunderstood their definition of the nature of the very specific RICO enterprise that [d]efendants sought to control through their racketeering activities." (Pls. Recons. Mem. at 1). The contention is rejected.

The Court understood clearly that plaintiffs were alleging an enterprise consisting of an association in fact formed by "the Downstate Dedicated MAS or 976–component of [NYTel]," employees and agents of NYNEX and NYTel, employees and agents of Ericsson, and certain unidentified long distance providers. (BRN Am. Compl. ¶ 115). The Court held, however, that plaintiffs failed to sufficiently allege that defendants engaged in the alleged racketeering activity to maintain control of the alleged enterprise, because it was apparent that defendants could maintain control of the alleged enterprise without engaging in the alleged racketeering activity. Plaintiffs take issue with that conclusion, but to no avail.

The alleged enterprise is a component or unit or other subdivision of NYNEX/NYTel. It may purchase goods and services from Ericsson and other providers, but it was established and is controlled by NYNEX/NYTel. It will remain a component or unit or other subdivision of NYNEX/NYTel, whether or not it engages in racketeering activity.

In contrast, the members of a street gang alleged to be an enterprise, for example, may need to engage in racketeering activities to maintain their power and con-

trol over the gang. As a matter of logic, however, a corporation need not engage in racketeering activities to maintain power and control over one of its own components or subdivisions.

Plaintiffs' own memorandum in support of their motion for reconsideration is telling as it purports to describe plaintiffs' RICO claim:

> [T]his network that [NYTel] and Ericsson knowingly constructed and reconstructed with inferior, unsuitable and non-standard equipment and software for [NYTel] usage, did not work adequately; did not produce accurate and reliable data on activity; and never properly provided the promised services to system users, including the [p]laintiffs. Through the racketeering activity alleged, [d]efendants strove for years to maintain control of this network by fraudulently concealing this reality, misleading [p]laintiffs (and the PSC) about the quality and performance of the equipment and software.

(Pls. Recons. Mem. at 2). In short, plaintiffs allege that defendants sold them a defective system and then tried to fraudulently cover up the defects. The sale of a defective "network" and the efforts to cover up the defects simply are not a proper basis for a RICO claim.

2. Plaintiffs' request for leave to replead their claims based on defendants' alleged misconduct before the PSC is denied. Plaintiffs now concede that New York courts do not recognize "spoliation" of evidence as an independent tort action, but they contend that they should be permitted to amend their complaints to plead negligence and prima facie tort claims. (*See* Pls. Recons. Mem. at 20). In making this argument, they rely on a decision of the Northern District of New York denying a motion to dismiss negligence and prima facie tort claims based on the negligent destruction of evidence at a fire scene. *Tietjen v. Hamilton–Beach/Proctor–Silex, Inc.*, No. 97–CV–188, 1998 WL 865586 (N.D.N.Y. Nov. 25, 1998).

Plaintiffs' arguments are rejected. Plaintiffs have not identified any legal theory that permits them to bring an independent cause of action based on an adversary's alleged misconduct in administrative proceedings, nor does such a cause of action make sense. It makes no sense that a party's misconduct or discovery abuse or perjury in an administrative proceeding can form the basis for an independent lawsuit for damages. It does not make sense, for example, for the parties to engage in discovery in this case to ascertain whether defendants engaged in discovery abuse in the proceedings before the PSC. It also does not make sense, for example, for this Court to conduct a trial to determine whether defendants destroyed or concealed evidence in the proceedings before the PSC. Plaintiffs may seek relief with respect to any such misconduct before the PSC, where the alleged misconduct occurred, and where, indeed, proceedings have been commenced on this very subject. If plaintiffs are dissatisfied with the results of those proceedings, they may seek further relief under Article 78 of the CPLR.

Another option is that if and when the instant cases go to trial, plaintiffs may request a preclusion order or an adverse inference instruction based on defendants' alleged destruction or concealment of evidence. Any such request, however, is premature, and in any event the alleged misconduct is not the basis for an independent cause of action for damages.

Finally, plaintiffs' reliance on *Tietjen* is misplaced, for there the destruction of evidence occurred prior to any suit being filed and the case did not involve alleged misconduct in administrative proceedings. Further, neither a negligence nor a prima facie tort theory is applicable to the claim of misconduct in this case. Plaintiffs have not alleged negligent conduct but have instead asserted intentional and fraudulent concealment. Moreover, to succeed on a claim for prima facie tort under New

York law, a plaintiff must allege "disinterested malevolence," that is, that the defendant's sole motive was to harm the plaintiff. *Curiano v. Suozzi,* 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324 (Ct.App.1984). Here, plaintiffs have not alleged that defendants acted with "disinterested malevolence"; rather, they have alleged that defendants engaged in the alleged misconduct before the PSC for their own self-interest: to avoid liability and to support their positions in those proceedings.

3. Plaintiffs request clarification of the Court's Opinion with respect to the claims against the individual defendants. The individual defendants did not make separate motions to dismiss and thus the Court did not consider the claims against the individual defendants separately from the claims against the corporate defendants. The claims against the individual defendants survive to the same extent that the claims against the corporate defendants survive.

While plaintiffs may proceed with their claims against the individual defendants (with respect to the claims that have survived), I note the following: Plaintiffs may have some meritorious claims, but those claims are obscured to a great extent by plaintiffs' kitchen-sink approach to litigation. Indeed, plaintiffs asserted sixteen causes of action, many of which had a tenuous basis, at best. Plaintiffs would be well-advised to consider whether it is to their advantage to continue to cast as wide a net as possible, or whether they would be better served by focusing their efforts on the claims that have merit, against the defendants that are the true parties in interest.

SO ORDERED.