**STATISTICAL PHONE PHILLY, et al., Plaintiffs,**

v.

**NYNEX CORPORATION, et al., Defendants. (and four consolidated cases)**

Nos. 96 Civ. 4139(DC), 96 Civ. 4141(DC), 97 Civ. 5404(DC), 98 Civ. 2593(DC), 99 Civ. 0304(DC).

United States District Court, S.D. New York.

Sept. 29, 2000.

Karen S. Burstein, New York City, for Plaintiffs Statistical Phone Philly, 8484 Associates, 3232 Associates, Eric Singleton d/b/a "Phone Service," and Anthony Colangelo.

Bressler, Amery & Ross by Eric L. Chase, Genevieve K. LaRobardier, New York City, for Plaintiffs Phone Programs, Inc.,Accurate Info Ltd., Fonawin Corp., ICN Ltd., and Accufon Corp.

Luboja & Thau, LLP by David Stein, New York City, for Plaintiff Meganews, Inc.

Harriette N. Boxer, New York City, for Plaintiff Walter Boxer succeeded by Dynatech Communications, Inc.

Davis Polk & Wardwell by Guy Miller Struve, Thomas P. Ogden, Nancy B. Ludmerer, Timothy P. Harkness, Helen Harris, Brian S. Weinstein, Robert Ernst, New York City, for Defendants NYNEX Corporation and New York Telephone Company.

## OPINION

CHIN, District Judge.

In these related cases, plaintiffs [1] are information providers ("IPs") that produce

___

1. There are five separate groups of plaintiffs in these consolidated actions: (1) Statistical

the recorded "telephone mass announcement" programs accessed by the public through 976 telephone numbers. Plaintiffs allege that defendants NYNEX Corporation and New York Telephone Company (together, "NYTel") engaged in gross negligence and wilful misconduct in 1990 when NYTel unilaterally implemented what the parties have referred to as the "Ericsson cutover"—a change in the equipment used to process the 976 telephone calls.

NYTel moves for summary judgment dismissing the complaints, contending that plaintiffs' claims are barred by the applicable statute of limitations. Pursuant to the applicable statutes of limitations, plaintiffs were required to commence suit within two or three years after each cause of action arose or, in the event of fraudulent concealment, within two years after plaintiffs had notice of a possible claim. The earliest of these cases, however, was not filed until June 4, 1996, almost six years after the Ericsson cutover was announced. Hence, the key issue is whether plaintiffs had notice of a possible claim prior to June 4, 1994—that is, more than two years before they filed suit.

■ On the record before the Court, a reasonable fact-finder could only conclude that plaintiffs did have notice of a possible claim before June 4, 1994. Indeed, the undisputed evidence shows that the call counts dropped in a "dramatic," "massive," and "precipitous" fashion following the cutover. IPs immediately began bombarding NYTel with complaints and thereafter also complained to the staff of the New York State Public Service Commission (the "PSC"). Certain IPs discussed and threatened legal action, hired a consultant with experience in telephone switching (who wrote a report concluding that NYTel had mishandled the cutover), and con-

sulted with counsel. One IP admitted at his deposition that he even consulted counsel about the statute of limitations at some point in 1990–1992. IPs urged the New York State Attorney General's Office and the PSC to investigate the cutover. All of these events took place from 1990 through 1993. And in 1993, at the urging of several IPs, the PSC commenced formal proceedings against NYTel based on the cutover. Three of the IPs have previously advised this Court that they brought their claims of gross negligence to the PSC within three years after the cutover. Significantly, however, they did not commence the earliest of these lawsuits until 1996.

Even assuming that NYTel fraudulently concealed its actions, the record demonstrates unequivocally that plaintiffs had notice of a possible claim against NYTel well before June 4, 1994. Hence, by the time plaintiffs filed suit, the statute of limitations had expired. Accordingly, defendants' motion for summary judgment must be granted; I do not reach plaintiffs' cross-motion for partial summary judgment on the issue of liability.

## BACKGROUND

The facts are set forth in detail in my prior decisions *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F.Supp.2d 565 (S.D.N.Y.1999), *reconsideration denied* (Apr. 30, 1999) ("Black Radio I") and *Black Radio Network, Inc. v. NYNEX Corp.*, Nos. 96 Civ. 4138 etc., 2000 WL 64874 (S.D.N.Y. Jan.25, 2000) ("Black Radio II"), and familiarity therewith is assumed. For purposes of this motion, the relevant facts are as follows:

### A. The Ericsson Cutover

Prior to September 1990, defendants used "AUTRAX" equipment manufactured

Phone Philly, 884 Associates, 3232 Associates, Eric Singleton d/b/a "Phone Service," and Anthony Colangelo (together "SPP") (complaint filed June 4, 1996); (2) Phone Programs, Inc., ("PPI") Accurate Info Ltd, Fonawin Corporation, ICN Ltd., and Accufon Corp. (together "Accurate") (complaint filed June 4, 1996); (3) Telsel, Inc. (complaint filed

July 23, 1997); (4) Meganews, Inc. (complaint filed April 12, 1998); and (5) Walter H. Boxer succeeded by Dynatech Communications, Inc. (complaint filed January 15, 1999). A sixth action, filed by plaintiff Black Radio Network, Inc. ("BRN") on June 4, 1996, was discontinued by the parties.

by the Audichron Company to play the IPs' pre-recorded messages to the calling public. AUTRAX kept a "peg count" by mechanically counting each call to the 976 numbers. Defendants were obligated to pay the IPs for each call made to a 976 number; accordingly, they issued monthly reports purporting to reflect the actual peg counts as reflected by AUTRAX. Unbeknownest to the IPs, between 1977 and 1990, defendants began to experience problems with the AUTRAX system leading them to estimate the number of calls to the 976 numbers and adjust the AUTRAX equipment manually.

On August 8, 1990, defendants unilaterally decided to replace AUTRAX with equipment manufactured by and sold by Telefonaktiebolaget LM Ericsson, Ericsson North America, Inc., and Ericsson Network System, Inc., in an event referred to by the parties as the "Ericsson cutover." Defendants implemented the Ericsson cutover one month later, in September 1990. It is defendants' switch to Ericsson equipment that forms the basis of plaintiffs' claims.

## B. *IPs' Knowledge*

### 1. *SPP, PPI, Meganews, and Fonawin*

#### a. *1990*

Immediately after the Ericsson cutover in September 1990, SPP, PPI, Meganews, and Fonawin all noticed a "massive," "dramatic" decrease in call volumes to their 976 numbers. (Deposition of Anthony Colangelo ("Colangelo Dep.") pp. 186–87; Deposition of Richard DeFuccio ("DeFuccio Dep.") pp. 14–15; Deposition of Bruce Fogel ("Fogel Dep") p. 130; Deposition of Kevin Monaghan ("Monaghan Dep.") pp. 95–96; Exs. II, QQ, UU).[2] From the outset, SPP, PPI, and Meganews all speculated that the drop in call volumes and other technical problems they were experiencing were attributable to the Ericsson cutover. (Exs.O, P, Q, Y, II, RR, UU, VV, XX).

Several IPs, including SPP, PPI, and Meganews, worked together, keeping each other informed of the steps they were taking with NYTel to solve the 976 system problems and discussing their legal options. (Mongahan Dep. pp. 94–96, 103; Exs. P, Y, RR, WW). In addition, SPP, PPI, and Meganews began "bombarding" NYTel with complaints about technical problems associated with the cutover; these complaints culminated in a November 1990 letter in which Meganews explicitly threatened to take legal action against NYTel. (Colangelo Dep. p. 205; Deposition of Nicholas Fusco ("Fusco Dep.") p. 233; Exs. Y, II, QQ, RR, UU, VV).

Unhappy with NYTel's response to their complaints, the IPs decided to involve the PSC in their dispute. (Deposition of Carol Brennan ("Brennan Dep.") pp. 42–43). The PSC obliged the IPs' request for intervention, and on December 19, 1990, the PSC staff attended a meeting with NYTel and several IPs including SPP, PPI, Meganews, and Fonawin. (Def. 56.1 ¶ 14). Also attending the meeting were Terrence M. Peck ("Peck"), a telephone switching consultant formally retained by Meganews but contacted frequently by other IPs, and Joel Dichter, general counsel of the Association of Information Providers. (Def. 56.1 ¶ 15; Deposition of Terrence Peck ("Peck Dep.") pp. 35–36, 42–43). At the meeting NYTel claimed that call volumes had declined because (1) the Ericsson Equipment was more accurate than AUTRAX; that is, NYTel had been overcompensating the IPs in the past; (2) a weak economy and seasonal trends affected the volume; and (3) there were "transitional" problems after the cutover. (Ex. Q). Nevertheless, NYTel offered to increase the IPs' compensation rate from $.09 to $.12 per call to offset their losses.

The IPs disbelieved NYTel's proffered explanations and were dissatisfied with the rate increase. (Def. 56.1 ¶¶ 16, 17; Brennan Dep. pp. 56–57; Colangelo Dep. p.

---

2. Unless otherwise indicated, the exhibits referred to herein are attached to the Affidavit of Guy Miller Struve in Support off Motion for Summary Judgment.

232; DeFuccio Dep. p. 89; Deposition of Robert Menzimer ("Menzimer Dep.") pp. 119–22; Exs. Q, R, YY).

### b. *1991–1992*

On January 2, 1991,[3] Peck issued a written report to Meganews in which he concluded that NYTel mishandled the Ericsson cutover and "should be pressured into explaining what happened, resolving the existing problems and making your company whole for subjecting your customers to this experience." (Ex. AA; Peck Dep. 70–75). In a contemporaneous memo, Meganews shared Peck's conclusions with SPP and indicated that Peck would "share his information" with PPI. (Ex. BB; Fusco Dep. p. 283).

A few days later, Peck's conclusions were echoed by the PSC. In a letter dated January 8, 1991 Yog Varma, Chief of Tariff and Rates at the PSC, suggested that NYTel implement numerous changes to the Ericsson system; the letter concluded:

> As indicated above, there have been definite problems since the changeover to the Ericsson switch, which have contributed to declining call volumes, and I believe the IPs should be compensated for lost volumes.... I endorse the company's decision to increase IPs' compensation levels, and look forward to the company's filing of appropriate tariff revisions .... However, I note this would not represent adequate compensation for vendors since the cutover of the Ericsson switch.
>
> It appears that IPs are entitled to retroactive adjustments to their compensation. I suggest the company review each IPs' call volumes pre and postEricsson changeover and determine, on a case-by-case basis, each IP's likely call volume loss ... [and] credit each IP $.09 per call lost from the time of the Ericsson changeover until the changes to the system discussed are implemented.

(Ex. Q). In response to the PSC's letter, on January 15, 1991 Meganews demanded compensation beyond that proposed by NYTel. (Exs. R, YY). Meganews copied

"PPI et al." on the letter. (Ex. R). Meganews, SPIS, and Peck then apparently discussed the possibility of settling their claims with NYTel for additional compensation in exchange for a "promise [ ] not to sue." (Ex. JJ).

It appears from the record that around this time NYTel was also contemplating settlement. Although it continued to deny liability and, indeed, even claimed that the IPs had "accepted the Company's explanations regarding call volume declines since the move to the Ericsson switch," on February 15, 1991 NYTel agreed to implement some of Varma's suggested changes and to pay the IPs retroactive compensation to "settle past call volume disputes." (Ex. S; Stein Aff. Ex. F). In fact, NYTel had misjudged the IPs' reactions to their explanations. (Affidavit of David Stein ("Stein Aff.") Ex. E; Ex. V). On April 2, 1991, PPI wrote to the PSC expressing its "outrage at the false, misleading and potentially damaging statements" made by NYTel, stating,

> [C]ontrary to [NYTel's] belief as stated in [its] letter, [PPI] has never accepted the Company's explanation regarding call volume declines, and still does not. In fact, if you were to poll the other IPs using the Ericsson switch, I seriously doubt whether most are happy with the explanation. They may have accepted it, as [NYTel] has stated, but practically speaking, what choice do they have?
>
> \* \* \* \* \* \*
>
> We are deeply concerned about the threat this problem poses for the future of our business here in New York so, [sic] I urge you to get involved and investigate this matter further.

(Ex. V). Meganews, too, asked for the PSC's involvement. (Ex. ZZ).

As the IPs requested, in September 1991 the PSC launched an investigation into their complaints regarding NYTel's new 976 service. (Exs. X, CC). As part of its investigation, the PSC held seven meet-

---

**3.** The report is erroneously dated January 2, 1990. (Peck Dep. p. 70).

ings in 1991 and 1992. Both NYTel and the IPs, including SPP, PPI, and Meganews, were given the opportunity to voice their concerns. (Exs. W, X, CC; Brennan Dep. pp. 75–76).

### c. *1993–1994*

Unhappy with the slow pace of the PSC investigation, PPI and Fonawin attempted (without success) to persuade the New York Attorney General's office to conduct its own investigation into the Ericsson cutover "fiasco." (Ex. PP, *see* Ex. SS). Two months later, in May 1993, the PSC finally issued a 38-page staff report on the investigation. (Ex. X). The IPs were dissatisfied with the report, however, believing it to unfairly and inaccurately favor NYTel. (Brennan Dep. pp. 88–89; Fusco Dep. pp. 324–25).

Accordingly, at the urging of the IPs, the PSC commenced a formal omnibus proceeding on May 29, 1993 to address the issues relating to the 976 system, the Ericsson cutover, and NYTel's failure to fully compensate the IPs. SPP and Fonawin[4] each sent information to the PSC for use in the proceeding. (Exs.Z, GG). Fonawin's letter to the PSC, dated October 23, 1993, was a "joint proposal," on behalf of itself, 13 other IPs, and NYTel to "dispose of virtually all the major issues" in the PSC proceeding. (Ex. GG). The proposal references the Ericsson cutover as one of the reasons for the decline in the IPs' call volumes. (Ex. GG). SPP, PPI, and Meganews were sent copies of the proposal. (Ex. GG).

### 2. *Accurate*

Accurate did not operate as a 976 IP in New York until 1993 when it entered into a license and option (exercised in 1994) to purchase Fonawin. (Deposition of Albert Angel ("Angel Dep.") pp. 54–59). Fonawin's knowledge and participation in the PSC proceeding are outlined above. In addition, prior to June 4, 1994, Accurate itself (1) knew of the Ericsson cutover (Angel Dep. pp. 84, 102–03); (2) possessed information on Fonawin's call volumes for the period of the Ericsson cutover (Angel Dep. pp. 98–99; DeFuccio Dep. pp. 123–24); (3) knew that Fonawin was concerned about the decline in call volumes between the late 1980s and 1992 (Angel Dep. p. 90; DeFuccio Dep. p. 125); and (4) authored the parties' joint proposal for submission to the PSC. (Ex. GG).

### 3. *Telsel*

Telsel sues as the assignee of Audiotel Services Inc., ("Audiotel"), the IP bidder that won the right to operate the "time of day" 976 number in 1990. Although Telsel was not involved in the PSC proceedings, the record reflects that Telsel, like the other IPs, was aware that call volumes "plummeted" following the Ericsson cutover and received complaints from customers. (Deposition of Touradje Torab ("Torab Dep.") pp. 126–28). Telsel claims that it "naive[ly]" believed NYTel's assurances that the problem was a "temporary glitch." (Torab Dep. p. 127).

Telsel "found out" about the December 19, 1990 meeting—apparently after the fact—but chose not to follow up with the other IPs or the PSC regarding the issues discussed there. (Torab Dep. p. 128–29). Correspondence in the record reflects that prior to February 14, 1991, Audiotel, Telsel's predecessor, had communicated with NYTel regarding the decline in call volumes following the Ericsson cutover; indeed, it appears that Audiotel asserted that NYTel had a legal obligation to "to keep the Time and Weather bidders whole." (Ex. KK). Although NYTel denied liability, it agreed to refund $175,000 of Audiotel's bid as compensation for its losses. (Ex. KK).

### 4. *Boxer*

Boxer is an IP who provided adult entertainment services through a 970, rather than 976, number. Unlike the other IP plaintiffs, Boxer's claims are based upon service problems beginning in December 1987 and ending in March 1990. Boxer

---

**4.** The Joint Proposal was submitted by ("Accurate Info., Ltd./Fonawin").

contends that defendants changed from AUTRAX to Ericsson equipment on the 970 lines in December 1987, causing him to experience problems similar to those encountered by the 976 IPs upon the September 1990 Ericsson cutover. (Boxer Am. Compl. ¶¶ 10–12). Despite the fact that he alleges the 970 "cutover" took place in 1987, Boxer did not file suit until eleven years later, on January 15, 1999.

In January 1988, Boxer, an attorney, formally requested compensation for losses he incurred due to a "45% decline" in call volumes. (Ex. LL; Boxer Compl. ¶ 12). In July 1988, Boxer explicitly threatened to "commence litigation" based on NYTel's "gross negligence." (Ex. MM). Two months later, in September 1988, NYTel and Boxer engaged in settlement negotiations; Boxer rejected NYTel's settlement offer and, from December 1987 to March 1990 when his 970 program was rendered "inviable," Boxer endorsed his checks from NYTel with the words "received under protest, reserving all rights." (Boxer Am. Compl. ¶¶ 19, 21, 29; Def. 56.1 ¶ 45). Even assuming that Boxer's threats were unrelated to the Ericsson cutover, PPI and SPP filed their complaints more than two years prior to Boxer's filing his lawsuit.

## C.  *Prior Proceedings*

### 1.  *The PSC*

As noted, following complaints from certain IPs, the PSC commenced its proceedings against NYTel in 1993. Following evidentiary hearings, the PSC's omnibus proceeding culminated in the issuance of a recommended decision, dated January 17, 1997, by Administrative Law Judge Frank Robinson (the "ALJ"); in his decision the ALJ found, *inter alia,* that NYTel mishandled the Ericsson cutover causing the IPs to lose calls and customers, and that NYTel's actions in connection with the cutover were characterized by gross negligence and wilful misconduct. On May 29, 1997, the PSC adopted the ALJ's recommended decision in substantial part, including the finding of gross negligence. *See New York Tel. Co. v. Public Serv. Comm'n,* 179 Misc.2d 301, 684 N.Y.S.2d 829, 831–32 (1998).

### 2.  *State Court*

Several IPs and defendants then commenced an Article 78 proceeding in New York Supreme Court, Albany County, challenging aspects of the PSC's order. On December 4, 1998, Judge Ceresia issued a decision confirming the determination of the PSC in its entirety. *New York Tel.,* 684 N.Y.S.2d at 834. Judge Ceresia summarized the PSC's findings of NYTel's gross negligence and wilful misconduct as follows:

> The company's long-term deception of both IP's and the Commission concerning its unauthorized Autrax call count adjustments was willful misconduct. The company was seriously negligent in pushing ahead with the Ericsson cutover in one gulp, rather than phasing it in, which would have enabled it to deal more efficaciously with the problems and avert serious harm to IP's. The unexpected troubles that did attend the cutover show that the company's planning for it was inadequate. Likewise inadequate was the company's handling of the troubles when they arose, further evidencing insufficient preparation. These basic elements of the cutover picture, taken together, constituted gross negligence. Furthermore, the company engaged in willful misconduct in striving to cover up its negligence and to defeat efforts to call it to account. This extended to willful misconduct in the company's litigation of this proceeding.

*Id.,* 684 N.Y.S.2d at 833. On May 11, 2000, the Appellate Division, Third Department affirmed. *See New York Tel. Co. v. Public Serv. Comm'n,* 271 A.D.2d 35, 707 N.Y.S.2d 534, 537 (3d Dep't 2000).

### 3.  *The Instant Actions*

Plaintiffs filed their claims in federal court from June 4, 1996 through January 15, 1999. *See supra* n. 1. NYTel moved to dismiss the complaints of SPP, PPI, Accu-

rate, and nonparty to this motion, BRN, on grounds of legal insufficiency and statute of limitations. On April 14, 1999, I issued a decision dismissing all of plaintiffs' claims except for certain claims based on the Ericsson cutover. *See Black Radio I.*

With respect to the statute of limitations issue, I ruled that plaintiffs' FCA claims were subject to a two-year statute of limitations and their state law claims were subject to a three-year statute of limitations.[5] *See id.* at 582. I further held that in the event of defendants' fraudulent concealment, plaintiffs were required to file suit within two years after they knew or should have known of their claims. *See id.* Based on the information before me at that time, however, I concluded that an issue of fact existed as to whether plaintiffs had inquiry notice of their claims. *See id.* at 582–83.

Thereafter, plaintiffs amended their complaints asserting: a claim for violation of the Federal Communications Act ("FCA"),[6] a claim for violation of the New York Public Service Law, and various state common law claims against defendants. Having amplified the record, NYTel moves for summary judgment on all claims based on the statute of limitations defense.[7] Plaintiffs cross-move for summary judgment on the issue of liability based on the decisions of the PSC and state courts.

## DISCUSSION

### A. *Inquiry Notice Standard*

■ In *Black Radio I,* I held that with respect to plaintiffs' federal claims, the two-year statute of limitations was tolled "only until the plaintiff has notice of a possible claim." *Black Radio I,* 44 F.Supp.2d at 582. A plaintiff is deemed to have notice of his claim such that his cause of action accrues when he:

has or with reasonable diligence should have discovered the critical facts of both his injury and its cause. Discovery of the "critical facts" of injury and causation is not an exacting requirement, but requires only knowledge of, or knowledge that could lead to, the basic facts of the injury, *i.e.,* knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it.

*Kronisch v. United States,* 150 F.3d 112, 121 (2d Cir.1998) (internal citations and quotation marks omitted). Similarly, New York law (applicable to plaintiffs' state law claims) provides that the three year statute of limitations is tolled for two years from the "time when facts were discovered or from the time when facts could with reasonable diligence have been discovered." N.Y. C.P.L.R. 203(g).

Applying these standards to the facts outlined above, no reasonable jury could find that plaintiffs lacked notice of their claims prior to June 4, 1994. Plaintiffs need only have known of the existence of their injury and the person or entity that inflicted it—knowledge they clearly had.

First, the critical facts of their injury were immediately apparent to the IPs. Indeed, the IPs all testified that they noticed "massive," "precipitous" declines in call volumes. Second, the IPs were aware from the outset that the decline in call volumes was caused by the Ericsson cutover. In 1991, the IPs' own telephone

5. Although the parties do not raise the issue, I note that there is some authority for the proposition that the FCA's two-year statute of limitations is applicable to plaintiffs' state law claims. *See MFS Int'l, Inc. v. International Telcom, Ltd.,* 50 F.Supp.2d 517, 520–21 (E.D.Va.1999). Applying this shorter limitations period to plaintiffs' state law claims obviously only further buttresses the holding that plaintiffs' claims are time-barred.

6. The parties agree that plaintiffs' FCA claims are limited to the period ending December 30, 1991 because the governing FCC tariff ceased to be effective on that date. *See Black Radio I,* 44 F.Supp.2d at 582.

7. PPI submitted an opposition brief that has been joined by SPP and Meganews. In addition, SPP and Boxer each filed separate briefs; Boxer did not, however, file an opposing Local Civil Rule 56.1 Statement. Telsel did not file or join an opposing brief or 56.1 Statement.

switching consultant told them that the cutover had been mishandled. Moreover, as of 1991, the IPs were aware that, in the PSC's opinion, (1) "there have been definite problems since the changeover to the Ericsson switch, which have contributed to declining call volumes," (2) the IPs were entitled to compensation for the losses, and (3) NYTel's proposed compensation plan was inadequate. Third, although NYTel may have attempted to mislead the IPs as to the cause of their injury, the IPs conceded that they did not believe NYTel's explanations. Fourth, several IPs discussed the possibility of taking legal action against NYTel or settling their claims. Fifth, the IPs succeeded in convincing the PSC to investigate NYTel's actions, and lobbied (although unsuccessfully) the New York Attorney General's Office to investigate as well. All of the above took place prior to 1994 and, collectively, establishes the IPs' inquiry notice of their claims. As if this were not enough, PPI admits that, far from being in the dark, it had inquiry notice of defendants' "probable and exasperating simple negligence." (PPI Br. p. 9). This admission is fatal not only to its own claims but to the other IPs' claims as well; what was known by one IP as of 1994 was, or in the exercise of reasonable diligence should have been, known by all.

Plaintiffs cite cases holding that to prevail on summary judgment, defendants "must demonstrate that no issue of material fact exists as to whether the plaintiff, if he or she had exercised reasonable diligence in response to a duty to inquire, would have discovered the fraudulent scheme." PPI Br. p. 41 (quoting *Lenz v. Associated Inns & Restaurants Co. of Am.*, 833 F.Supp. 362, 371 (S.D.N.Y.1993)). Plaintiffs' cases are inapposite. Here, plaintiffs were not kept in the dark. They knew there was a problem; they investigated it; they consulted experts and counsel; they threatened to sue; and they went to the PSC. What they did not do, until 1996, was commence suit. The fact that plaintiffs may not have known all the facts giving rise to their claims is of no consequence; that is why parties engage in discovery. Inexplicably, plaintiffs chose to conduct that discovery through the PSC rather than through litigation.

### B. Plaintiffs' Arguments

Despite the overwhelming evidence of plaintiffs' notice of their claims prior to June 4, 1994, plaintiffs argue that the statutes of limitations do not bar their claims as a matter of law because: (1) the statutes were tolled while they exhausted their administrative remedies with the PSC; (2) they were unaware of defendants' gross negligence and wilful misconduct—required under defendants' tariffs for liability—until Spring 1996, in large part due to defendants' fraudulent concealment of their claims; (3) the doctrine of equitable estoppel precludes defendants from asserting the statutes of limitations as a defense; and (4) the statutes were tolled by defendants' "continuing wrongs."

### 1. Exhaustion of Administrative Remedies with the PSC

Plaintiffs first argue that the PSC has "primary jurisdiction" to hear their claims and they were therefore required to exhaust their administrative remedies with the PSC prior to filing an action in this court. Under plaintiffs' theory, timely filing of their claims with the PSC satisfied the applicable statutes of limitations.

#### a. The Doctrine of Primary Jurisdiction

Plaintiffs appear to be conflating the concepts of exhaustion of administrative remedies and primary jurisdiction. The Supreme Court has explained:

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its

course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Indeed, plaintiffs' position, that the doctrine of primary jurisdiction required them to present their claims to an administrative agency—here the PSC—in the first instance has been rejected by the Supreme Court. *See Reiter v. Cooper,* 507 U.S. 258, 268–69, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) ("[R]espondents contend that the doctrine of primary jurisdiction requires petitioners initially to present their unreasonable-rate claims to the ICC, rather than to a court. That reflects a mistaken understanding of primary jurisdiction .... The result that respondents seek would be produced, not by the doctrine of primary jurisdiction, but by the doctrine of exhaustion of administrative remedies."); *see also Capital Tel. Co. v. Pattersonville Tel. Co.,* 56 N.Y.2d 11, 22, 451 N.Y.S.2d 11, 16, 436 N.E.2d 461 (1982) (citing *United States v. Philadelphia Nat. Bank,* 374 U.S. 321, 353, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (primary jurisdiction reference does not "oust" jurisdiction but only "postpones" it)).

Admittedly, it appears that at least one New York court has also confused the concepts, dismissing a case under the doctrine of primary jurisdiction due to plaintiff's failure to exhaust his administrative remedies with the PSC. *See Blair v.*

*NYNEX Corp.,* No. 14692/95, 1996 N.Y. Misc. LEXIS 531, at *9 (Oct. 15, 1996), *aff'd,* 246 A.D.2d 336, 667 N.Y.S.2d 365 (1st Dep't 1998). Nevertheless, neither *Blair,* nor the cases it relies upon, lends support to the idea that the doctrine of primary jurisdiction tolls the statute of limitations during the pendency of the agency proceeding. Indeed, there is both federal and New York case law to the contrary.[8] *See Reiter,* 507 U.S. at 268, 113 S.Ct. 1213 (when referring issue to administrative agency under doctrine of primary jurisdiction, court has discretion to stay case or to dismiss it "if the parties would not be unfairly disadvantaged") (citing *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 222, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) (court erred in dismissing rather staying case pending agency review when statute of limitations would later bar claim)); *Himmelman v. MCI Communications Corp.,* 104 F.Supp.2d 1, 9 (D.D.C. 2000) ("dismissal pursuant to primary jurisdiction does not toll the statute of limitations"); *Sternberg v. New York Water Serv. Corp.,* 94 A.D.2d 723, 462 N.Y.S.2d 609, 610 (2d Dep't 1983) (court should stay action pending resolution of complaint by PSC "because of the possible prejudice to plaintiff from dismissal"); *Guglielmo v. Long Island Lighting Co.,* 83 A.D.2d 481, 489, 445 N.Y.S.2d 177, 182–83 (2d Dep't 1981) ("[I]t is our opinion that the PSC has primary jurisdiction in this matter. There remains, nevertheless, a question as to whether dismissal of the complaint was the proper remedy here. We think it was not. We cannot say with assurance that for Statute of Limitations reasons plaintiff will not be prejudiced by a dismissal."); *cf. Higgins v. New York Stock Exchange, Inc.,* 942 F.2d 829, 833–34 (2d Cir.1991) ("the doctrine of primary jurisdiction ordinarily comes into play after suit is filed

---

8. Moreover, even assuming that pursuant to *Blair* the applicable statute of limitations is tolled during PSC proceedings, the *Blair* court specifically held that "the primary jurisdiction doctrine does not apply to cases involving the enforcement of a tariff as opposed to a challenge concerning its reasonableness."

*Blair,* 1996 N.Y. Misc. LEXIS 531, at *6. Here, plaintiffs do not challenge the reasonableness of the tariff but rather seek to enforce it. *See Black Radio I,* 44 F.Supp.2d at 576–577. Accordingly, plaintiff's reliance on *Blair* is misplaced.

and the statute of limitations is thus stopped from running.") (internal quotations and emphasis omitted). Accordingly, the doctrine of primary jurisdiction does not assist plaintiffs in avoiding the statutes of limitations.

### b. *Exhaustion of Administrative Remedies*

■ The issue of primary jurisdiction aside, it is clear that plaintiffs were not required to exhaust their claims with the PSC prior to filing suit. First, plaintiffs are incorrect in their assertion that New York Public Service Law §§ 90–98 grants the PSC exclusive, original jurisdiction over claims—such as theirs—that do not challenge the reasonableness of a tariff. *See, e.g. Capital Tel. Co. v. Pattersonville Tel. Co.,* 56 N.Y.2d 11, 21, 451 N.Y.S.2d 11, 16, 436 N.E.2d 461 (1982) (where plaintiffs do not challenge reasonableness of tariff but rather seek to enforce federal antitrust laws, PSC does not have exclusive, original jurisdiction); *Lauer v. New York Telephone Co.,* 231 A.D.2d 126, 128–29, 659 N.Y.S.2d 359 (3d Dep't 1997) (court may hear claims against telephone company for willful misconduct and gross negligence without resort to PSC); *see also Black Radio I,* 44 F.Supp.2d at 574 ("plaintiffs do not challenge, either directly or indirectly, the reasonableness of the rate contained in any filed tariff").

■ Second, when an administrative agency lacks the authority to grant plaintiffs the complete relief they seek, the doctrine of exhaustion of administrative remedies is inapplicable. *See Mrs. W. v. Tirozzi,* 832 F.2d 748, 756 (2d Cir.1987) (exhaustion not required when "it is improbable that adequate relief can be obtained by pursuing administrative remedies"); *Haddad v. Salzman,* 188 A.D.2d 515, 516, 591 N.Y.S.2d 193, 194 (2d Dep't 1992) (dismissal for failure to exhaust administrative remedies improper where administrative body unable "to provide 'adequate and complete relief' "). It is undisputed that the PSC lacked the power to award plaintiffs the monetary damages they seek from NYTel. *See New York Tel.,* 684 N.Y.S.2d at 834. Plaintiffs were therefore not required to exhaust administrative remedies with the PSC before proceeding directly in Court. The statutes of limitations continued to run while plaintiffs proceeded before the PSC and, accordingly, their claims are time-barred.

Plaintiffs should have done sooner precisely what they eventually did in these actions—they filed the instant cases, prior to the PSC's determination of the matter, seeking "to enforce, obtain and/or preserve here those legal claims for relief, rights, and remedies which are unavailable within the limited jurisdiction of the NYPSC." PPI Compl. ¶ 56; *see* SPIS Compl ¶ 59; Meganews Compl. ¶ 55; Pl. Mem. p. 21 ("Although Plaintiffs arguably have yet to fully exhaust their administrative remedies pending a decision on appeal of Defendants' Article 78 Proceeding, their filing of this action was cautionary with respect to a possible limitation issue at a later time.").

### 2. *Plaintiffs' Ignorance of the Extent of Their Claims and Defendants' Alleged Fraudulent Concealment*

Plaintiffs next argue that even if they had notice of some wrongdoing by defendants, the statutes of limitations were nevertheless tolled until Spring 1996 when they acquired evidence—previously fraudulently concealed by defendants—of NYTel's gross negligence and wilful misconduct. Parsed out, plaintiffs appear to advancing three interrelated arguments. First, they claim that because defendants' tariffs limit NYTel's liability to cases of gross negligence or wilful misconduct, plaintiffs could not have filed a complaint against NYTel, consistent with Rule 11 of the Federal Rules of Civil Procedure, until they had proof of such conduct. Second, plaintiffs argue that until they had knowledge of defendants' gross negligence and wilful misconduct they did not have a claim upon which they could bring suit. Third, plaintiffs assert that defendants'

fraudulent concealment of their gross negligence and wilful misconduct tolled the applicable statutes of limitations. Plaintiffs are incorrect.

### a. *Rule 11 Standard*

██ It is true that Rule 11 requires an attorney to form a reasonable belief that a complaint is well grounded in fact and warranted by existing law (or a good faith argument for the extension, modification, or reversal of existing law), prior to filing a lawsuit. *See* Fed.R.Civ.P. 11; *Rotter v. Leahy*, 93 F.Supp.2d 487, 502 (S.D.N.Y.2000). Rule 11 is "flexible," however, "allowing pleadings based on evidence reasonably anticipated after further investigation or discovery." *Rotella v. Wood*, 528 U.S. 549, 120 S.Ct. 1075, 1083, 145 L.Ed.2d 1047 (2000); *see* Fed.R.Civ.P. 11 (attorney certifies "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."). Thus, Rule 11 explicitly does not require a plaintiff to know all the facts supporting his claims prior to filing suit.

Moreover, plaintiffs' arguments that Rule 11 prevented them from filing suit earlier are undermined by their actions in this case. When PPI, Accurate, SPP, and Meganews actually filed suit, their complaints asserted claims for simple negligence—a fact that belies their current assertion that they waited for evidence of gross negligence before bringing suit due to the restrictions in defendants' tariffs. (PPI/Accurate Compl. ¶¶ 82–85; SPP Compl. ¶¶ 85–88; Meganews Compl. ¶¶ 84–87). Furthermore, plaintiffs' original complaints did not make specific factual allegations of defendants' gross negligence; instead they merely reiterated their simple negligence claims and tacked on a conclusory paragraph stating: "In their failures to fulfill their duties to Plaintiffs and to each of them, [NYTel's] conduct was reckless and/or wanton and/or malicious and [NYTel was], therefore, grossly negligent." (PPI/Accurate Compl. ¶ 87; SPP Compl. ¶ 90; *see* Meganews Compl. ¶ 89).

### b. *Level of Knowledge for Inquiry Notice*

██ Plaintiffs also misconstrue the level of knowledge of their claims they needed to start the statutes of limitations running. To the extent that plaintiffs are arguing that the statute of limitations did not begin to run until they had evidence of defendants' gross negligence or wilful misconduct their argument is incorrect as a matter of law. As the Second Circuit has explained:

[A] plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice. A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence.

*Kronisch*, 150 F.3d at 121 (internal citations and quotation marks omitted); *Miller v. Acheson Industries*, No. 403331/97, 1999 WL 509506, at *3 (N.Y.Sup. May 26, 1999) ("certainty in knowing the cause of the injury is not required to a finding that a cause of action has accrued ... Once a person is aware of an injury, he is required to make an investigation into the potential causes of the condition and is charged with the knowledge that a reasonable inquiry would have revealed."); *Asbedian v. New York City Human Resources Admin.*, 2 F.Supp.2d 397, 399–400 (S.D.N.Y.1998) (statute of limitations not tolled while plaintiff tries "to gather information to substantiate his claim.").

The case law thus demonstrates unequivocally that plaintiffs did not need evidence of defendants' gross negligence to be deemed to have notice of their claim.

No reasonable juror could fail to find that plaintiffs knew (or in the exercise of due diligence should have known) enough critical facts about both their injury and its cause to protect themselves by seeking legal advice well before June 1994. Indeed, at some point between 1990 and 1992, one IP who is a no longer a party to these actions did contact counsel about filing a lawsuit. The IP admitted that one of the reasons he sought legal advice was because he was "worried about a statute of limitations problem." (Deposition of Jay Levy ("Levy Dep.") pp. 134–35, 182–83). Plaintiffs have not identified any information that was unique to BRN that would have allowed BRN, but not them, to realize there was a statute of limitations problem.

Moreover, PPI and Accurate represented to this Court that they properly brought an action before the PSC within the three-year statute of limitations for negligence and gross negligence. (PPI/Accurate Dismissal Mem. p. 66). If, by their own admission, they knew enough about defendants' alleged gross negligence and wilful misconduct to bring an action before the PSC, it is difficult to discern how they did not have enough information to file a lawsuit. Accordingly, plaintiffs' argument that the statute of limitations was tolled until they had evidence of defendants' gross negligence or wilful misconduct is rejected.

### 3. *Fraudulent Concealment*

■ Finally, plaintiffs argue that the statutes of limitations were tolled due to defendants' fraudulently concealment of their gross negligence and wilful misconduct. I disagree. As a preliminary matter I note that the federal law of equitable tolling governs plaintiffs' federal cause of action while the state law of equitable tolling governs plaintiffs' state law claims. *See Meridien Int'l Bank Ltd. v. Government of Republic of Liberia*, 23 F.Supp.2d 439, 446 (S.D.N.Y.1998).

#### a. *Federal Law*

■ The federal doctrine of equitable tolling "was developed in the context of actions based on fraud, but has been applied in cases alleging causes of action other than fraud where the facts show that the defendant engaged in conduct, often itself fraudulent, that concealed from the plaintiff the existence of the cause of action." *Id.* (internal quotations and citations omitted). Under this doctrine, "the statute of limitations does not begin to run until 'the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice.' " *Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir.1974)). Thus, "the statute of limitations will be tolled if the plaintiff pleads, with particularity, the following three elements: (1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." *Butala v. Agashiwala*, 916 F.Supp. 314, 319 (S.D.N.Y.1996); *see Meridien*, 23 F.Supp.2d at 446.

■ Even assuming plaintiffs are correct that defendants wrongfully concealed information establishing their gross negligence, plaintiffs have failed to show that this concealment prevented their discovery of the nature of their claim. Plaintiffs' tolling argument only works if the fraudulent concealment succeeds in depriving plaintiffs of notice; otherwise every fraudulent concealment claim would result in tolling. The question is whether plaintiff knew enough to sue. As demonstrated from the facts above, plaintiffs clearly did. The fact that plaintiffs may not have had all the facts pertinent to their claims is of no consequence, as "equitable tolling is intended to provide relief where a plaintiff

is not aware of the existence of a cause of action, not where a plaintiff is aware of the cause of action but believes that [it] may not have sufficient evidence to prove [its] case." *Torre v. Columbia University*, No. 97 Civ. 0981, 1998 WL 386438, at *8 (S.D.N.Y. July 10, 1998), *aff'd without opinion*, 189 F.3d 462 (2d Cir.1999).

Moreover, both by word and deed plaintiffs admit that they were not misled by defendants' efforts at concealment. (Def. 56.1 ¶¶ 20, Exs. Q, R, YY; Colangelo Dep. p. 232; Menzimer Dep. pp. 121–22). Not only do plaintiffs outright concede that they did not believe NYTel's explanations, their actions in persuading the PSC to launch an investigation prove their disbelief. Accordingly, plaintiffs have failed to point to material facts from which a reasonable jury could conclude that defendants' wrongful concealment prevented plaintiffs from discovering the nature of their claims within the limitations period. *See Schermerhorn v. James*, 96 Civ. 980, 1997 WL 681345, at *2 (S.D.N.Y. Oct.31, 1997) (equitable tolling rejected where "plaintiffs concede that they did not believe any such alleged misrepresentations or rely on them"), *reconsideration denied*, 1998 WL 40205 (S.D.N.Y. Feb.2, 1998), *aff'd sub nom., Schermerhorn v. MTA*, 156 F.3d 351 (2d Cir.1998).

#### b. *State Law*

■ Under New York law, "[i]t is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." [9] *Simcuski v. Saeli*, 44 N.Y.2d 442, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978). As under federal law, however, plaintiffs' notice of their claims precludes their reliance on defendants' fraudulent concealment. *See id.* (if "the conduct relied on (fraud, misrepresentation or other deception) has ceased to be operational within the otherwise applicable period of limitations" courts deny application of the tolling doctrine); *Harris v. Wilmor-*

*ite Corp.*, 266 A.D.2d 902, 697 N.Y.S.2d 439, 440 (4th Dep't 1999) ("The doctrine of equitable estoppel will not apply if the plaintiff possesses 'timely knowledge' sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations.") (quoting *McIvor v. Di Benedetto*, 121 A.D.2d 519, 520, 503 N.Y.S.2d 836 (2d Dep't 1986)).

#### c. *NYTel's Denials of Wrongdoing*

■ Finally, plaintiffs appear to argue that because NYTel denied that it was guilty of gross negligence and wilful misconduct in the PSC proceeding, for example by arguing that "the evidence does not prove that NYTel acted in a grossly negligent manner," plaintiffs were kept unaware of their claims. Taking plaintiffs' theory to its logical extreme, so long as a defendant denies wrongdoing or characterizes the available evidence in its favor, the statute of limitations cannot begin to run. This argument is plainly without merit. *See Forbes v. Eagleson*, 19 F.Supp.2d 352, 376 (E.D.Pa.1998) ("Mere denials of wrongdoing will not of themselves toll the statute of limitations.... The plaintiff may, of course, collect further information during the limitations period and, to the extent stymied, seek it in discovery. But the running of the limitations period will not await the plaintiff's satisfaction as to the merits of his or her case, much less the defendant's voluntary self-incrimination.") (internal citations omitted); *United States v. Incorporated Village of Island Park*, 791 F.Supp. 354, 375 (E.D.N.Y.1992) ("To hold that a defendant who attempts to conceal from a plaintiff those matters about which the plaintiff already knows may not later assert the bar of time in his favor would be to foreclose the operation of the statute of limitations for any action in which the defendant did not concede liability before the complaint itself is filed.").

---

**9.** New York law does not distinguish between the doctrines of fraudulent concealment and equitable estoppel. *See Meridien*, 23 F.Supp.2d at 446 n. 4.

### 3. *Equitable Estoppel*

■ To the extent that plaintiffs are arguing that the doctrine of equitable estoppel—as distinguished from fraudulent concealment—bars defendants from raising the statute of limitations as a defense, their argument fails under both state and federal law. As noted above, under New York law, the doctrines of equitable estoppel and fraudulent concealment are analyzed in the same manner; accordingly, with respect to their state law claims, plaintiffs' estoppel argument fails for the reasons set forth above. *See Meridien,* 23 F.Supp.2d at 446 n. 4 ("Under New York State law, cases referencing fraudulent concealment rely on the same analysis as that provided for under equitable estoppel. In fact, cases regarding fraudulent concealment as a tolling principle point to the same cases as those which discuss the doctrine of equitable estoppel").

■ Under federal law, equitable estoppel differs from fraudulent concealment in that it "is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing his lawsuit." *Cerbone,* 768 F.2d at 50. Plaintiffs' estoppel argument is therefore logically inconsistent with their assertion that they did not know of their cause of action. *See Butala,* 916 F.Supp. at 321 n. 1 ("A condition precedent to asserting equitable estoppel is that plaintiffs knew of their cause of action—knowledge they deny having for purposes of their argument of fraudulent concealment. It is paradoxical for plaintiffs to argue, on the one hand, that they knew about their claim for the purpose of equitable estoppel, but, on the other hand, that they did not know about their injury for the purpose of determining when the action accrued in the first place."). Accordingly, the doctrine of equitable estoppel does not preclude defendants from raising the statute of limitations as a defense.

### 4. *Continuing Wrongs*

■ Finally, plaintiffs argue that under New York law the statutes of limitations do not bar their (presumably state law) claims because defendants' alleged gross negligence and wilful misconduct continued "into and through" 1996. Plaintiffs correctly state that under New York law, " '(d)espite the general principle that a cause of action accrues when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuous wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act.' " *Neufeld v. Neufeld,* 910 F.Supp. 977 (S.D.N.Y.1996) (quoting *Leonhard v. United States,* 633 F.2d 599, 613 (2d Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981)). Plaintiffs do not, however, identify any "last wrongful act" allegedly committed by NYTel in 1996 (or at any other point after June 4, 1994).

Instead, plaintiffs cite the 1996 findings of the ALJ "that call volumes [of the IPs] even today are lower than they would have been but for the problems associated with the cutover, and that this situation will persist, albeit with a declining proportionate impact, for at least some period of time in the future." (Pl.Mem. p. 48). While this testimony arguably shows that the ALJ believed plaintiffs to be suffering from harm in 1996 as a result of NYTel's allegedly wrongful acts, it does not establish that NYTel committed a wrongful act in 1996. Even assuming that plaintiffs did continue to feel the effects of NYTel's allegedly wrongful acts as late as 1996, the case law upon which they rely makes clear that the statute of limitations is tolled only until the last wrongful *act.* Accordingly, plaintiffs have failed to point to any evidence from which a reasonable jury could find a continuing wrong tolling the statute of limitations.

It is clear from the record that a reasonable fact-finder could only conclude that plaintiffs were on inquiry notice of their claims (or in the exercise of reasonable

diligence should have been on notice) prior to June 4, 1994. Although this result may seem harsh and unfair in light of the PSC's findings of NYTel's liability, I am constrained to conclude that plaintiffs' claims are time-barred as a matter of law.

### CONCLUSION

Because plaintiffs' claims are barred by the applicable statutes of limitations, defendants' motion for summary judgment is granted. The complaints are dismissed. I do not reach plaintiffs' cross-motion for partial summary judgment on the issue of liability. The Clerk of the Court shall enter judgment accordingly and close these five consolidated cases.

SO ORDERED.